In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1690

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

YETUNDE FOLAMI, also known as "Tawa,"

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 80--James B. Zagel, Judge.

Argued October 26, 2000--Decided January 9, 2001

Before EASTERBROOK, KANNE, and EVANS, Circuit Judges.

EVANS, Circuit Judge. Sometimes it's better to be real late than just a little late. With that, Yetunde Folami would certainly agree. For had she been just a tad later than she was for an appointment at a hotel in Chicago's Lincoln Park area, chances are she would not be here today appealing her conviction on a drug charge.

This case, involving a conspiracy to distribute a kilo of heroin, started in Africa's largest city--Lagos, Nigeria. There, a Nigerian woman named "Lynda" recruited another Nigerian woman, 41-year-old Nina Iwese, to smuggle drugs into the United States. On February 3, 1999, Lynda gave Iwese a cardboard box containing 10 individually wrapped packages of heroin and a round-trip ticket to Chicago with a stop at JFK International in New York City. Lynda gave Iwese a detailed itinerary. She was to fly to New York with the box and, upon arrival, place a telephone call back to Lagos; from New York she was to go to Chicago and, once there, again call Lynda for further instructions; in Chicago, a person whom Lynda did not identify was to meet Iwese, get the box, and pay Iwese $5,000 for her efforts; mission accomplished, she was then to return to Nigeria.

With the box packed inside her luggage, Iwese boarded a flight bound for New York. After a

stopover in Brussels, Belgium, the plane arrived at JFK airport on February 4. All's well so far, but things quickly went haywire. At the airport, agents from the United States Customs Service searched Iwese's luggage and discovered over a kilo of heroin, most of it 83 percent pure, which testimony showed had a wholesale value of approximately $100,000 and a "street" value of $2.5 million.

Iwese was arrested and, with very few attractive alternative options, she agreed to continue her journey, this time in cahoots with the government. Iwese called Lynda in Nigeria and, without mentioning her arrest, reported that she "arrived safely" in New York and was ready to fly to Chicago, which she did, with undercover government agents, the next morning, February 5.

In Chicago, Iwese went, as directed, to the Days Inn hotel at the corner of Clark Street and Lincoln Avenue. There, agents reserved two adjacent rooms--one (room 620) to use as the site of the expected delivery of heroin and the other as the "command center" from which activities in room 620 could be monitored. Room 620 was bugged with various audio and video recording devices.

Once in room 620, Iwese placed and received a number of telephone calls. During the first of these calls, which occurred soon after noon on February 5, Iwese spoke with Lynda and gave her the hotel's telephone number and the room number. Lynda told Iwese that a person in London named "Tony" would call the hotel room within 3 hours and "connect" Iwese with the person in Chicago who was to pick up the dope. Around mid-afternoon, "Tony" telephoned Iwese and said that another person would call her. A few minutes later, Iwese received a call from Yetunde Folami, who identified herself as "Tawa." Tawa told Iwese, "Maybe I will see you [in a] couple of hours," and added, "When I finish at work I will come and see you." Iwese said that she had just spoken with Tony, and she asked Folami, "So when you are coming . . . are you coming with eh . . . the money for me to collect from you first or what?" Tawa replied, "Before I come I'll call you back again." But the phone didn't ring.

With no action by 7 p.m., Iwese again called Lynda in Nigeria. Iwese told Lynda that she had spoken to both Tony and Tawa but that Tawa had not yet come to the hotel. Lynda gave Iwese Tony's cellular telephone number. She also instructed Iwese to remove the individually wrapped packages of heroin from the box, saying that the packages were ultimately to be divided among Tony, a man named "Onoche," and another person.

After unsuccessfully attempting to call Tony, Iwese placed another call to Lynda that evening. Lynda told Iwese that she (Lynda) neither knew Tawa nor her telephone number. Perhaps clairvoyant, Lynda cautioned Iwese not to place calls from the hotel and not to discuss "things" with Tawa over the telephone because "people might be listening."

No one arrived at the hotel that evening so the agents decided to continue the stakeout through the following morning--Saturday, February 6.

At approximately 10:15 a.m. on February 6, Iwese spoke with Lynda and advised her that Tawa still had not arrived at the hotel and that she (Iwese) was considering throwing in the towel and catching a plane back to Nigeria. But Lynda assured her that "[t]hey will come" and that "[t]hey will call you." Iwese was told to "wait for them" and "be patient." Lynda then told Iwese that she (Lynda) would try to call Onoche and "ask him if there's any other person he thinks we can trust."

Without any action, the spirits of the agents dampened, so around 11:30 a.m. they decided to abort the operation. The recording equipment in the room was dismantled and the group was poised to leave the hotel.

Just before noon, however, as Iwese and four agents were about to leave room 620, the investigation received a shot of adrenalin as Folami arrived at the door. Had she been 10 minutes later, the room would have been empty. But no such luck for Folami. One of the agents looked through a peephole and saw Folami standing on the other side of the door. The agent noted that she was "nervously" looking back and forth while waiting for the door to open.
The agents quickly tried to make the best of the situation. The box containing the heroin was placed on the bed and the agents hid, two in the bathroom and two in a closet. With the agents out of view, Iwese partially opened the door and greeted Folami, who said she was "Tawa" and that she had come to pick up the "package." Folami stepped inside. Iwese complained that she had been waiting a long time, asking Tawa "what [had taken] her so long." Folami said, "We have been taking our time" because the hotel was in a "dangerous area."

Iwese then pointed to the box on the bed as Folami asked whether they were "alone." Iwese said yes as Folami said she had "to be very careful." Folami walked past Iwese toward the bathroom, where she opened the door and saw the

hiding agents. She then bolted out of the room, down a hall, and into a stairwell. But the agents were faster.

As Folami was arrested, agents saw her attempting to "hide something." The something was a piece of paper with the names "Tony," "Nina" (Iwese's first name), the phone number of the hotel and the number "620."

The facts led to an indictment charging Folami with conspiracy to possess more than a kilogram of heroin with intent to distribute and a substantive count of attempting to possess heroin. A jury trial resulted in conviction on the conspiracy count and acquittal on the attempted possession count. From the conviction, Folami appeals.

Folami contends that the evidence is insufficient to support the jury's verdict. Her task, therefore, is a daunting one for she must establish that no rational jury could have concluded that she was a member--even a minor one--of a conspiracy to possess heroin with intent to distribute. United States v. Larkins, 83 F.3d 162, 165 (7th Cir. 1996). And we view, of course, the evidence in the light most favorable to the government. Id.

Here, there is no doubt that a conspiracy, as charged in the indictment, existed. The question is whether the facts, as we have related them, are sufficient to prove that Folami was one of the conspirators.

Defendants, of course, have a Fifth Amendment right not to testify in their cases, but they must live with the consequences of their decisions. Here, Folami did not testify, so the jury, other than a little bit of conjecture in closing argument by her attorney, heard no reasonable--and innocent--explanation for her presence at the door to room 620. Therefore, in the real world, a "mere presence" defense was going to be a hard sell to any rational jury. And apparently it was in this case.

To be sure, the facts gave Folami a slight basis for arguing that she simply was in the wrong place at the wrong time: she didn't have a stack of money with her when she arrived at the door to room 620 and, once inside, she didn't immediately go for the box of heroin on the bed. On the other hand, it certainly strains credulity to suggest that someone on the receiving end of a valuable shipment of heroin would entrust its pick up from an international courier (Iwese) to a complete stranger (Folami). Putting two and two together, the jury could easily have reasonably

concluded that Folami knew why she went to room 620. Couple this reasonable inference with the suspicious nature of "Tawa's" phone conversations, the note in her possession, her nervousness at the door, her concern for privacy when she entered the room, and her hightailing it out of the room when she learned the bathroom wasn't empty, and enough facts, and inferences, point to her knowing participation in the illegal scheme. The evidence, we conclude, was sufficient to support the jury's verdict.

Folami next questions the admissibility of opinion testimony offered to the jury by a Drug Enforcement Administration agent who explained how drug deliveries involving "middlemen" are often conducted. We have examined the questioned testimony and find nothing in it that is objectionable. The testifying agent made no mention of Folami, much less to the facts of her case. Juries of lay persons, generally unfamiliar with the underworld of drug importation, transportation, delivery, and distribution, often need information about how the system works, and judges would be remiss in keeping it from them. Here, the testimony of how "middlemen" generally operate was properly received.

The final claim on appeal relates to the heroin which, strangely, was not "available" at the trial. Before the trial started, the government attorney, sheepishly no doubt, explained:

With regard to the heroin--we don't have it . . . . What happened is it was tested by the DEA lab, brought back to the Customs inventory and last seen on September 23[, 1999,] when we went to go take it out for evidence. It isn't there. It looks like it has been destroyed because there was a huge destruction of unnecessary drugs on September 23. Although that is still being investigated.

I don't think it is relevant to any of the issues in this case. The documentation is very clear that all of our witnesses here did not have any--would not have had access to it in any way. Mr. Frankel [Folami's counsel] suggested that he was going to be questioning along those lines. However, at no point did he ever contest the chemical analysis or anything like that. Since none of our witnesses would be involved with the disappearance of these drugs or the destruction of these drugs, it is not really relevant to the case and it throws in a bunch of red herrings.

The judge agreed with the AUSA's point, concluding that the destruction of the heroin was not "relevant yet," but he noted, without elaborating, that "it could become relevant

depending on [the defendant's] case-in-chief." As such, the court ruled that Folami would "not be able to bang any of [the government's] witnesses over the head with this," because the matter had "nothing to do with impeachment."

In arguing that her due process rights were abridged by this ruling Folami relies heavily on California v. Trombetta, 467 U.S. 479 (1984), and United States v. Kelly, 14 F.3d 1169 (7th Cir. 1994). These cases, however, support, rather than undermine, the challenged decision.

In Trombetta, the Supreme Court observed that the loss or destruction of evidence does not implicate the Due Process Clause of the Fourteenth Amendment, at least in the absence of "official animus" or a "conscious effort to suppress exculpatory evidence." 467 U.S. at 488. Trombetta coupled this requirement with one of materiality, holding that the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 489.

In Kelly, the defendant argued that the district court erred in permitting testimony as to certain narcotics evidence "in light of the loss of . . . the evidence and an inadequate chain of custody." 14 F.3d at 1174. We rejected the argument, finding that the defendant

has presented no evidence that the seized narcotics evidence, which disappeared after being analyzed, was lost in bad faith. Further, there is no indication that the contraband was anything but what the chemical analysis indicated it to be--cocaine and heroin. In addition, [the defendant] had the opportunity to cross-examine all government witnesses . . . about the seized evidence and the loss.

Id. at 1175. We went on, however, in Kelly to note that we were "troubl[ed]" by the lack of an explanation for the loss of the evidence and counseled prosecutors in future cases to "provide an explanation if similar losses occur." Id. Nevertheless, we concluded that "in light of our previous holding in [an earlier case] that seized narcotics need not be placed before the jury, we do not believe the government's failure to explain the loss of drugs requires suppression of the officers' testimony." Id.

Here, the district court's treatment of the destruction of evidence issue was fully in keeping with the principles of Trombetta and Kelly. There was no allegation, much less

evidence, of bad faith on the part of the government, the destroyed evidence was not exculpatory or otherwise material, there was no dispute that the evidence was in fact heroin, and the government provided an explanation, although not a comprehensive one, for its destruction. See United States v. Nesbitt, 852 F.2d 1502, 1520-21 (7th Cir. 1988) (rejecting due process argument based upon destruction of evidence, where defendant failed both bad faith and materiality prongs of Trombetta test), abrogated on other grounds by United States v. Durrive, 902 F.2d 1221 (7th Cir. 1990), superseded by statute on other grounds by United States v. Guerrero, 894 F.2d 261 (7th Cir. 1990).

   More to the point, Trombetta and its progeny are essentially inapposite. This authority, again, governs instances in which a defendant seeks the suppression of testimony concerning material evidence alleged to have been destroyed in bad faith. Such a request to suppress is properly made to the district court as a means of precluding, in the first instance, the presentation of such testimony to the jury on the ground that the government's conduct compromised the defendant's right to a fair trial; conversely, Trombetta is not authority for the proposition that a defendant may seek generally to attack the credibility of government witnesses, particularly where those witnesses, as is the case here, had absolutely nothing to do with the inability to produce the evidence in court.

   The fact that Folami was precluded from cross-examining the government's witnesses about the destruction of the heroin is unimportant in this case. Through this proposed cross-examination, the defense was not seeking to discredit the notion that Iwese was carrying heroin with her or to suggest that the chain of custody was broken in such a way as to render the drug evidence somehow unreliable. Indeed, the defense foreshadowed as much in a pretrial submission:

The case involves the defendant's state of mind when she retrieved a package from a cooperating individual. . . . The defense will not dispute that the cooperating individual was carrying drugs at the time of her arrest, that she came to Chicago to attempt to deliver the drugs, that the defendant appeared at the hotel room where the cooperating individual was staying, and that the defendant left the room after discovering two agents hiding in the bathroom.

At trial, consistent with its theory, the defense stipulated to the precise nature and quantity of the drug evidence (1,071.1 grams of heroin), as

well as the complete, predestruction chain of custody.

   The best we can say here is that Folami sought to elicit testimony regarding the destruction of the heroin as a means of impeaching government witnesses. But these witnesses, as the district court correctly noted, were not themselves involved in, or responsible for, its disappearance. Under these circumstances, the court correctly precluded the defense from pursuing this line of cross-examination. AFFIRMED.