In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 12-3349 & 13-1524

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JEREMY COOPER and STEVEN MCDOWELL,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Western Division.
Nos. 10 cr 50078-1, 10 cr 50078-4 — **Frederick J. Kapala**, *Judge.*

ARGUED APRIL 22, 2014 — DECIDED SEPTEMBER 12, 2014

Before POSNER, WILLIAMS, and TINDER, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Jeremy Cooper and Steven McDowell were convicted on charges related to a heroin distribution conspiracy. They appeal, arguing first that there was insufficient evidence to support their conspiracy conviction. But a jury could reasonably conclude that they were co-conspirators given the evidence that McDowell and Cooper coordinated to obtain and sell drugs. Because there is sufficient evidence to support his conspiracy conviction, the dis-

trict court correctly held McDowell responsible for his co-conspirators' possession of firearms in furtherance of the conspiracy. And the district court did not clearly err in finding McDowell and Cooper responsible for more than one but less than three kilograms of heroin based on Harris's admission and the other reliable evidence, or in increasing McDowell's offense level for being a leader of the conspiracy given the evidence that the conspiracy involved at least five individuals and he organized and exerted control over them. Therefore, we affirm Cooper's and McDowell's convictions and sentences.

## I. BACKGROUND

In January 2011, Steven McDowell ("McDowell"), Jeremy Cooper, Norman Breedlove, Murray Harris, and Robert Presley were charged with conspiring to possess with intent to distribute and to distribute one kilogram or more of heroin in Rockford, Illinois. McDowell was also charged with six counts of distributing heroin, in violation of 21 U.S.C. § 841(a)(1). In addition to the conspiracy charge, Cooper was charged with four counts of distributing heroin, one count of possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A), and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).

Steven McDowell's mother, Donia McDowell ("Donia"), and her boyfriend, Vaughn Johnson, testified at trial. But their trial testimony, in which they denied having much knowledge about the defendants' alleged drug activities, was much less illuminating than their grand jury statements. The government impeached them with their previous statements and introduced redacted versions of the grand jury

testimony into the record as substantive evidence. Donia testified in her statement to the grand jury that she saw Cooper, Presley, and another individual cut and package drugs inside her apartment on Longwood Street (an apartment that McDowell, whose name was also on the lease, allegedly helped her rent). She also overheard her son Steven discuss purchasing drugs from Chicago twice a week with Cooper, Harris, and Presley, and she estimated that they bought about $1500 worth of drugs per trip. Donia testified that McDowell financed the heroin buys while Cooper, Presley, and Harris sold the drugs. According to Donia's and Johnson's grand jury testimony, this drug activity continued through the summer, with McDowell, Cooper, Harris, and Presley using Donia's apartment to mix and package the heroin, and selling it from the apartment and its parking lot. Donia also testified that Cooper and Presley recruited other men to help sell the drugs, and that she told her son that Harris had to move his operations elsewhere when guns began showing up at her apartment. Johnson testified that Harris, Cooper, and Presley then asked to sell their drugs out of his apartment, a request he declined.

Other individuals testified about the drug activity at Longwood. Law enforcement investigators and their informants made controlled purchases of heroin from Cooper at the Longwood apartment twice in November 2010. Charles Dixon, who lived across the street, testified that he received drugs from the apartment on occasion and saw McDowell, Cooper, and Presley there "all the time." Detra White visited the Longwood apartment "practically every day" and testified that Cooper and Presley tried to persuade her to buy heroin in addition to her regular purchases of crack cocaine. Rodney Love, Johnson's friend and a frequent

visitor to Longwood, told the jury that after he was released from jail in November 2010, he saw Cooper and Presley package heroin in the Longwood apartment and sell it in the surrounding area. He testified that Melvin Jordan operated as their tester, trying the drugs to ensure quality. After the government refreshed his memory with his grand jury statement, Love testified that McDowell began selling heroin on a small scale a year earlier, but by November 2010, he had "got[ten] big and had people working for him."

Frank Freeman, who rented an apartment on Chestnut Street to McDowell and Presley, testified in his grand jury statement that those defendants used the apartment to sell drugs. When investigators searched the Chestnut apartment in October 2010, Cooper was inside, along with a gun, cell phones, several packets of heroin, and packaging materials. Outside the apartment, in a car rented to McDowell, they found a traffic citation issued to Cooper and money transfer receipts bearing McDowell's name.

Rockford Police Detective Gabe Wassner's trial testimony established that he made several controlled buys from several of the men charged in the conspiracy. In August 2010, Detective Wassner bought fifteen bags of heroin from Breedlove. That purchase led Detective Wassner to McDowell, who sold Wassner's informant twenty-one bags of heroin and told him to have Wassner come directly to McDowell when Wassner needed more heroin. The informant testified that McDowell also told him that, if McDowell's runners were ever unable to provide him heroin, he should call one of five other individuals involved in selling heroin. Detective Wassner subsequently purchased heroin from McDowell and Harris—McDowell's brother—making two purchases in

October, two in November, and one in December. For each of these purchases, he negotiated the price with McDowell and received the drugs from Harris, who was often driven to the pickup spot by McDowell or someone driving McDowell's car. McDowell and Presley were arrested after Wassner's December drug buy, and a bag of heroin was found close to their car.

At trial, Breedlove also told the jury that, beginning in June, McDowell began selling him $500 worth of heroin for $350 twice a week beginning in June. But in mid-July, McDowell said he was stepping away from selling drugs and that Breedlove should buy from Harris in the future. From then on, Breedlove got most of his drugs from the Longwood apartment, in the same multi-colored packaging and at the same discounted price. He frequently saw individuals preparing the drugs under the supervision of Harris, Presley, and Cooper. During some of his visits to Longwood, Cooper or Presley retrieved Breedlove's drugs at Harris's direction, but usually Harris handled Breedlove's drug transactions. And on the occasions when Breedlove was not satisfied with the product, McDowell got involved, promising to "fix the problem" by ensuring Breedlove and his complaining customers got better drugs. In late October, after Breedlove had received another bad batch of drugs from Harris, McDowell told Breedlove he was stepping back in to handle the drug sales and was on his way to buy some drugs. McDowell later sold drugs to Breedlove and gave him a free pack to make up for the bad drugs Breedlove had received from Harris.

On December 1, 2010, there was a shootout at the Longwood apartment after White gave a bag of firearms to Pres-

ley and Cooper in exchange for crack cocaine and cash. As it turned out, the guns likely belonged to White's son, Fred, who tried to get them back, but when Cooper refused, they drew their weapons and gunshots rang out. Donia, Johnson, and Love all saw both Presley and Cooper with guns before the pair fled the scene in Cooper's rental car. Nine shell casings were recovered and matched to a handgun found in Cooper's car when he and Presley were arrested the next day after selling heroin to a police informant. Investigators also recovered a large amount of cash, bags of heroin, another handgun, an ammunition clip, and a video showing Cooper handling piles of money and making references to drug trafficking from Cooper's hotel room. In Presley's room, they found scales, grinders, sifters, bottles of Dormin, and other drug paraphernalia.

Cooper's charge for possessing a firearm in furtherance of a drug trafficking offense was dismissed at the close of the government's case, but the jury found Cooper and McDowell guilty on each of the other counts and found that the conspiracy involved more than one kilogram of heroin during their participation in it. Their co-conspirators, Breedlove and Harris, pled guilty to the conspiracy charges against them and admitted that the conspiracy involved more than one but less than three kilograms of heroin.

At Cooper's sentencing hearing, the government proposed that the conspiracy and Cooper were responsible for 1,048 grams of heroin each month from April to December 2010, for a total of more than five kilograms and an offense level of 34. But the district court rejected the government's estimate and found Cooper responsible for more than one but less than three kilograms of heroin, with a correspond-

ing base offense level of 32. With an adjusted offense level of 34 and a criminal history level of V, Cooper's advisory guidelines range was 235-293 months' imprisonment for the conspiracy charge and the court sentenced him to 270 months. (The other charges yielded shorter sentences to be served concurrently).

The trial judge rejected McDowell's argument at sentencing that he should not be held responsible for the drugs Presley and Cooper distributed and found that McDowell's offense conduct involved more than one but less than three kilograms of heroin. The court also applied a four-level enhancement to McDowell's sentence for leading a criminal activity involving at least five participants. After concluding that McDowell knew that Presley and Cooper possessed guns to further the conspiracy, the court also applied a two-level enhancement for possession by a co-conspirator of a dangerous weapon in furtherance of the conspiracy. McDowell was sentenced to 315 months on the conspiracy charge and 240 months on the other counts, to run concurrently. Cooper and McDowell appeal their conspiracy convictions and sentences.

## II. ANALYSIS

Cooper and McDowell both argue that there is insufficient evidence to support their conspiracy convictions or to find them responsible for more than one kilogram of heroin. McDowell also argues that the district court erred by enhancing his sentence for possessing a firearm and for being a leader of the conspiracy. We take these arguments in turn.

### A. Sufficient Evidence to Support Conspiracy Convictions

Cooper and McDowell's task of overturning their conspiracy convictions is a daunting one, as it requires them to show that no rational jury could have concluded that a conspiracy existed and that they were members. *See United States v. Folami*, 236 F.3d 860, 863 (7th Cir. 2001); *see also United States v. Johnson*, 729 F.3d 710, 714 (7th Cir. 2013) ("We will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." (internal quotations omitted)). Viewing the evidence in the light most favorable to the government, as we must, *Folami*, 236 F.3d at 863, there is ample evidence to support a finding that Cooper and McDowell conspired with others to possess and distribute at least one kilogram of heroin.

To convict on the conspiracy charge, the government had to prove that "(1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined in the agreement." *United States v. Johnson*, 592 F.3d 749, 754–55 (7th Cir. 2010). The record must evidence an agreement to distribute, which can be established through the parties' relationships and conduct. *Id.* at 756. Relevant evidence includes proof that they "embraced the [conspiracy's] criminal objective," maintained "co-operative relationships," and "had some appreciable ability to guide the destiny of the [drugs]." *United States v. James*, 540 F.3d 702, 707 (7th Cir. 2008) (internal citations and quotations omitted). There is no real dispute on the facts before us that a conspiracy existed. The issue is whether the evidence is

sufficient to show that Cooper and McDowell were participants.

Cooper argues that he merely associated with conspirators. He is right that mere presence at the scene of a drug deal does not a co-conspirator make, *see United States v. Taylor*, 600 F.3d 863, 868 (7th Cir. 2010), and if the evidence only showed that he was in the Chestnut Street apartment when drugs and packaging paraphernalia were recovered and occasionally happened to be in the Longwood apartment, we might have a different case. But, unfortunately for Cooper, the evidence of his entanglement with the conspiracy is much more damaging, and supports a finding that he coordinated with the other alleged co-conspirators to sell drugs.

We begin with the testimony of McDowell's mother Donia, who made statements in her testimony before the grand jury that implicated McDowell, Cooper, Harris, and Presley in drug-trafficking activities. At trial, however, Donia claimed that, while she remembered testifying before the grand jury, she did not remember making the incriminating statements and did not know about the group's alleged illicit activities. Once she denied those statements, her grand jury testimony was admitted at trial. Federal Rule of Evidence 801(d)(1)(A) permits the court to admit a prior inconsistent statement given under oath for the truth of the matter asserted in the statement when the declarant testifies at trial and is subject to cross-examination regarding the prior statement. *See* Fed. R. Evid. 801(d)(1)(A) (declaring that a testifying declarant's prior inconsistent statement is not hearsay when that statement was given under penalty of perjury); *United States v. DiCaro*, 772 F.2d 1314, 1321 (7th Cir. 1985) ("Since prior inconsistent statements that come within this

Rule are defined as not being hearsay, they may be admitted as substantive evidence for the truth of the matter asserted, and not merely for impeachment purposes."). Donia, the declarant, denied any knowledge of the facts at issue and claimed she could not recall her prior statements to the grand jury. She therefore made statements during her testimony at trial that were inconsistent with her admissions before the grand jury. *See United States v. Williams*, 737 F.2d 594, 608 (7th Cir. 1984) ("[W]e do not read the word 'inconsistent' in Rule 801(d)(1)(A) to include only statements diametrically opposed or logically incompatible. … [I]f a witness has testified to certain facts before a grand jury and forgets them at trial, [her] grand jury statement falls squarely within [the rule]." (quotations and internal alterations omitted)). And defense counsel was free to cross-examine her about the grand jury statements. *See DiCaro*, 772 F.2d at 1322 (finding that a witness's "professed amnesia concerning the subject matter of [her] grand jury testimony … does not alone render [her] not subject to cross-examination under the Rule"). Given those circumstances, there was no problem with the court's admission of Donia's grand jury statement as substantive evidence at trial. The rule is designed for situations like the one the prosecutors faced in this case. *See* Fed. R. Evid. 801(d)(1)(A) advisory committee note (recognizing that the rule protects a party from "the 'turncoat' witness who changes his story on the stand and deprives the party calling him of evidence essential to his case" (quotations omitted)).

With that established, we return to the specific evidence showing Cooper's involvement with the drug distribution scheme. In the portion of her grand jury statement that was admitted at trial, Donia stated that she heard Cooper,

McDowell, Presley, and Harris talk about buying drugs twice a week from Chicago, and estimated that they brought $1300 to $1500 worth of drugs after each trip for sale on the streets of Rockford. She described Cooper's coordination with Presley, whom the record suggests is his father. Throughout the summer, Donia saw Presley and Cooper mix and package heroin in her apartment and sell it from her parking lot in a car rented by McDowell. Her testimony was confirmed by White, a regular customer of Cooper's who told the jury that Cooper and Presley tried to persuade her to buy heroin in addition to her daily cocaine purchases. Dixon, Johnson, and Love also verified Donia's account with their testimony that they witnessed Cooper prepare and sell drugs with Presley and Harris throughout the summer. And they did not work alone. According to Donia, Cooper and Presley enlisted several young people to help with the drug sales.

Additional evidence connected Cooper and Presley's drug activities to those of Harris. Breedlove's testimony suggested that Harris controlled the Longwood drug operation and Cooper and Presley worked for him. Although he usually worked directly with Harris to secure his drugs, Breedlove testified that sometimes Cooper got involved in his transactions at Harris's direction. He offered the jury an illustration, describing a time when Harris gave Cooper the key to retrieve Breedlove's drugs. He also spoke of an occasion when Cooper, in Harris's absence, took Breedlove's money but did not want to return it when Breedlove tired of waiting for the drugs. But when Breedlove called Harris, Cooper promptly returned his money. Breedlove also confirmed that young people were working under Harris, Cooper, and Presley's supervision to prepare heroin in the

Longwood apartment. This evidence would allow a rational jury to find him guilty of conspiring to possess and distribute heroin.

McDowell's argument fares no better. He took the stand and admitted to conspiring with his brother Harris to distribute sixty grams of heroin but denied joining the larger conspiracy with Cooper and Presley. McDowell argues there is no evidence of coordination or of a mutually beneficial relationship between him, Cooper, and Presley, and claims that the evidence only demonstrates that he associated with them or, at most, had a buyer-seller relationship with them, which is insufficient to prove conspiracy. *See Taylor*, 600 F.3d at 868 ("[M]ere association with conspirators, knowledge of a conspiracy and presence during conspiratorial discussions is not sufficient to convict a person of conspiracy." (internal quotations and citations omitted)); *Johnson*, 592 F.3d at 754 (conspiracy to distribute requires proof of more than a buyer-seller relationship).

We disagree and find sufficient evidence on the record to establish that McDowell conspired with Harris, Cooper, and Presley to buy and sell heroin. Donia testified, in the excerpt of her grand jury statement admitted at trial, that McDowell, Harris, Cooper, and Presley all sold drugs together, that she heard McDowell discuss the conspiracy's drug operations with them, and that she knew McDowell financed their drug buys twice a week. Add Breedlove's testimony that the bags of heroin he received from Harris, Cooper, and Presley out of McDowell's mother's apartment were similar to the drug packages he had previously received from McDowell himself and that McDowell was able to take control whenever there was a problem with the drugs Breedlove bought from

Longwood, and a reasonable jury could conclude that McDowell participated in the heroin distribution conspiracy with Harris, Cooper, and Presley.

The jury's finding is also supported by the evidence that McDowell rented the apartment on Chestnut Street with Presley, which was the same apartment where Cooper was found with drugs and drug paraphernalia with a car rented by McDowell and used by Cooper parked outside. That McDowell may not have touched the drugs on a daily basis does not save him. *See United States v. Spagnola*, 632 F.3d 981, 986–87 (7th Cir. 2011) (recognizing that the government does not have to prove defendant knew every other conspirator or was involved in every aspect of the crime). Given the evidence presented, we will not overturn the jury's reasonable finding that McDowell knew of and intentionally joined the conspiracy to possess and distribute one kilogram of heroin.

## B. Drug Quantity Finding Was Reasonable

Cooper next argues that the court erred in finding that the conspiracy distributed more than one but less than three kilograms of heroin during his association with it. McDowell asks us to vacate the court's finding that the same drug quantity was attributable to him given his position that there was insufficient evidence to connect him to the conspiracy, but incorporates Cooper's argument in case we view the evidence differently. Since we disagree and find that the evidence supports his conspiracy conviction, we confine our discussion to whether the preponderance of the evidence supported the finding that the conspiracy was responsible for distributing one to three kilograms of heroin while Cooper and McDowell were involved with it.

Based in part on Donia's grand jury statement that she became aware that the co-conspirators were distributing drugs as early as April 2010 and Freeman's grand jury testimony that Presley brought fifty to sixty grams of pure heroin from Chicago to Rockford twice a week, the government argued at sentencing that the conspiracy produced over a kilogram of diluted, street-level heroin every month from April to November, for a total of at least five kilograms. Cooper challenged the government's calculation, and argued that the court was bound by the stipulation during Breedlove's and Harris's sentencing hearings that the conspiracy involved more than one but less than three kilograms of heroin. Noting that the government did not provide adequate evidence to support its calculation, the trial court declined to accept it and agreed with Cooper and McDowell that they were responsible for the same drug quantity that was attributed to their co-conspirator Harris, which was more than one but less than three kilograms of heroin.[1]

But Cooper and McDowell now argue on appeal that the court's drug quantity finding, which they urged below, was in error. They assert that the evidence did not support a finding that they were responsible for even one kilogram of heroin. We generally review a district court's drug quantity finding for clear error, and will reverse only if a review of the record leaves us with a "firm and definite conviction that a mistake has been made." *See United States v. Adams*, 746 F.3d 734, 739–40 (7th Cir. 2014). But in arguing for a drug

---

[1] Both Harris and Breedlove pled guilty and stipulated that the conspiracy distributed one to three kilograms of heroin, and Harris was sentenced based on that stipulated drug quantity. Breedlove's sentencing was delayed pending his related appeal.

quantity finding of one to three kilograms, Cooper and McDowell forfeited the argument that the evidence only supported a finding of less than one kilogram of heroin, and therefore also forfeited the application of clear error review. However, we still review this claim for clear error since the government did not argue forfeiture in its appellate brief and instead responded to Cooper's argument. *See United States v. Prado*, 743 F.3d 248, 251 (7th Cir. 2014) ("[W]here the government fails to assert that an argument was forfeited and fails to identify the standard of review appropriate for such a forfeiture, the issue is treated as if the objection were raised below and the standard of review appropriate to such an issue controls.").

The district court did not clearly err in holding Cooper and McDowell accountable for more than one but less than three kilograms of heroin. Breedlove and Harris admitted that the conspiracy distributed that amount of heroin, and the district court reasonably relied on those admissions in attributing that drug quantity to the conspiracy. *See United States v. Medina*, 728 F.3d 701, 705 (7th Cir. 2013) (recognizing that the court only has to find that it was more likely than not that defendants possessed the amount of drugs in question). And we have previously held that where the district court attributes one drug quantity to some conspirators, it may not attribute a different drug quantity to other conspirators on an identical record. *United States v. Taylor*, 600 F.3d 863, 871–72 (7th Cir. 2010). So the court was bound by its acceptance of Breedlove's and Harris's stipulations that the conspiracy distributed one to three kilograms of heroin, unless there was evidence justifying holding Cooper and McDowell accountable for a different quantity. *See United States v. Block*, 705 F.3d 755, 761–62 (7th Cir. 2013) (suggest-

ing that the district court can "consider new evidence in sentencing a defendant after making an earlier drug quantity determination for his co-conspirator").

Cooper and McDowell argue that *Taylor* did not prevent the court from deviating from their co-conspirators' stipulated drug quantity because their factual records were different and the court had "new evidence" that the stipulations were based on the government's flawed calculation. But they fail to point to any material difference between their factual records and Harris's that would justify holding them responsible for a lesser drug quantity. Cooper argues, without citation, that the evidence showed that he was involved in the conspiracy for a shorter time than Harris. But we strain to find support for that assertion in the record. To the contrary, the evidence supports a finding that Cooper and Harris were both involved throughout the entire charged conspiracy—from the time Donia became aware they were selling drugs from her house in April until Cooper and others were arrested in December. Cooper and McDowell's argument that the government's drug calculation constituted new evidence similarly fails. The government's calculation, however flawed, was not evidence. It was an argument—one in fact that the district court rejected—and the argument did nothing to change the factual record before the court. Cooper and McDowell therefore fail to provide a basis to justify attributing a different drug quantity amount to their conspiracy convictions than the one to three kilograms that was found in Harris's case.

Their only surviving argument, then, is that there was insufficient evidence altogether to support the court's finding that the conspiracy involved more than one but less than

three kilograms of heroin. They assert that based on the evidence at trial, no rational jury could find that the conspiracy involved even one kilogram of heroin. But the trial judge, who is responsible for determining the appropriate drug quantity finding, is not limited to the evidence introduced at trial and only has to find that the preponderance of reliable evidence supports the drug quantity finding. *See United States v. Longstreet*, 567 F.3d 911, 923–24 (7th Cir. 2009). The collection of evidence bearing indicia of reliability, including Breedlove's and Harris's admissions and Donia's, Freeman's, and others' testimonies establishing the extent and duration of the conspiracy, supported a finding that the conspiracy involved at least one kilogram of heroin. *See United States v. Araujo*, 622 F.3d 854, 863–64 (7th Cir. 2010) (affirming that trial judges may estimate the relevant drug quantity based on sufficiently reliable evidence regarding the size of the conspiracy's drug sales, frequency of the dealing, and duration of the criminal enterprise). The drug quantity finding was not clearly erroneous.

### C. No Error in McDowell's Sentence

McDowell challenges two elements of his sentence: the two-level enhancement for possessing a firearm and the four-level enhancement for being a leader of a conspiracy involving five or more participants. The United States Sentencing Guidelines provide for a two-point increase to a defendant's sentence "if a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b). This enhancement applies if the defendant "actually or constructively possessed a gun, or if coconspirators possessed firearms in furtherance of jointly undertaken criminal activity so long as their possession was reasonably foreseeable to the defend-

ant." *United States v. Harris*, 230 F.3d 1054, 1057 (7th Cir. 2000) (internal citations omitted). McDowell admits that Presley and Cooper possessed guns in furtherance of the conspiracy and concedes that the enhancement applies if his conspiracy conviction stands. Since we uphold his conspiracy conviction, we will not disturb the district court's application of the possession enhancement.

McDowell also objected to the four-level enhancement for being a leader of a criminal organization involving five or more participants, pursuant to U.S.S.G. § 3B1.1(a). He instead argued that § 3B1.1(c)'s two-level enhancement should apply. But after finding that McDowell exercised decision-making authority over the drug operation, gave instructions to other participants, and resolved consumer disputes, the district court concluded that McDowell led a criminal activity of five or more participants and applied the enhancement.

On appeal, McDowell contests the finding that he was a leader or organizer of the criminal organization *and* the finding that the scheme involved five or more participants. But, before the district court, his counsel conceded that he was a leader or organizer and proceeded solely on a theory that the preponderance of the evidence did not support finding that the criminal enterprise involved at least five participants. During McDowell's sentencing hearing, the trial judge and McDowell's counsel engaged in the following exchange:

> [Court]: … Mr. Phillips, you concede that the defendant was a leader or organizer of a criminal enterprise under Section 3D1.1(c).
>
> …
>
> [Counsel]: … Yes, I did, Judge.

> [Court]: … And the reason I assume that you're contesting that he's not a leader or organizer under (a) is just the number of the co-conspirators.
>
> [Counsel]: That is correct, Judge.
>
> [Court]: That's the only difference between (a) and (c).
>
> [Counsel]: That's correct.

We are therefore faced with another instance of McDowell making an argument before this court that he forfeited below, which would normally preclude clear error review. But this is *déjà vu*, because once again the government failed to argue forfeiture, and so we will again proceed as though McDowell preserved his argument below. *See Prado,* 743 F.3d at 251. We review the district court's determination of McDowell's role in the criminal organization and the number of participants for clear error. *See Longstreet*, 567 F.3d at 925.

U.S.S.G. § 3B1.1 directs the district court to increase a defendant's offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants … ." Even though the criminal activity must involve at least five participants, the defendant only has to "have had some real and direct influence, aimed at furthering the criminal activity" over one of them. *United States v. Mustread*, 42 F.3d 1097, 1103 (7th Cir. 1994); *see* § 3B1.1 cmt. n.2. In determining whether the defendant held a leadership or organizational role, the district court should consider, among other things, "the exercise of decision making authority, the nature of participation in the commission of the of-

fense, … the degree of participation in planning or organizing the offense, … and the degree of control and authority exercised over others." § 3B1.1 cmt. n.4; *United States v. Robertson*, 662 F.3d 871, 877 (7th Cir. 2011). "The central concern of § 3B1.1 is the defendant's relative responsibility for the commission of the offense." *United States v. Vazquez*, 673 F.3d 680, 685 (7th Cir. 2012) (quoting *United States v. Mendoza*, 576 F.3d 711, 717 (7th Cir. 2009) (internal quotations marks omitted).

Witnesses testified that McDowell was the drug organization's leader and that, in addition to securing the apartments where the drugs were sold, he financed the drug buys and sent Presley to Chicago to get the raw heroin for sale in Rockford. He therefore organized the offense and "influence[d] the criminal activity by coordinating its members." *See United States v. Are*, 590 F.3d 499, 521 (7th Cir. 2009). His mother's testimony that she went to McDowell after the shootout to have him tell Harris and others selling drugs from her apartment that they had to leave sheds further light on the influence he held over the individuals involved in the criminal enterprise. Breedlove's testimony also showed that McDowell exercised decision-making authority, at least over Harris. Not only was McDowell able to dictate a discounted price for Breedlove's purchases from Harris, but he had the power to step in and command lower prices or complimentary drugs whenever there was a problem with Harris's product. McDowell argues the evidence mentioned above did not support the court's finding because the other factors listed in the Guidelines were absent, but "no single § 3B1.1 factor is essential in determining whether the adjustment applies, and a court need not assign equal weight to each factor." *Robertson*, 662 F.3d at 877.

McDowell also argues that the trial court erred because it did not make a specific finding about whom McDowell controlled; it did not state, as we did above, that it was Harris whom McDowell controlled. But we cannot fault the district court for not doing so because, again, McDowell conceded that he was a leader and the main issue before the district court was how many participants the organization involved. Nevertheless, we reiterate that although naming the controlled individual assists in our review, the district court is not required to explicitly name the participant the defendant controlled so long as it is clear from its findings and the evidence that the defendant actually did manage or supervise a participant. *United States v. Mansoori*, 304 F.3d 635, 669 (7th Cir. 2002). The court's conclusion that McDowell "instructed other participants" and "resolved disputes over the quality of the heroin" is supported by the record and makes clear that the court found that McDowell managed or supervised Harris, and we find no error with its failure to specifically name Harris.

The district court likewise did not clearly err in finding that the trafficking organization involved at least five individuals. McDowell argues that Breedlove was not a participant in the drug scheme, but that argument is ineffective because the district court found that the criminal organization involved at least five participants even if we remove Breedlove from its count, and we agree that there were more than five participants without including him. Harris, Presley, and Cooper were all convicted as participants in the conspiracy. And witnesses testified that numerous other individuals assisted with mixing and packaging the drugs in the Longwood apartment and several others acted as "runners" for McDowell, distributing his drugs to individual consumers.

Those individuals are properly considered participants in the organization. *See* § 3B1.1 cmt. n.1 ("A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."); *United States v. Zuno*, 731 F.3d 718, 723 ("What matters is that the person knowingly aided some part of the criminal enterprise." (quoting *United States v. Blaylock*, 413 F.3d 616, 618 (7th Cir. 2005))). The district court did not clearly err in finding that McDowell was a leader of at least one participant in a criminal organization involving five or more participants, and so did not clearly err in applying the four-level enhancement.

### III. CONCLUSION

The convictions and sentences of Jeremy Cooper and Steven McDowell are AFFIRMED.