In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-2513

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL L. CHAPARRO,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:16-cr-50010-1 — **Frederick J. Kapala**, *Judge.*

ARGUED DECEMBER 11, 2019 — DECIDED APRIL 13, 2020

Before FLAUM, HAMILTON, and BARRETT, *Circuit Judges.*

HAMILTON, *Circuit Judge.* A jury found Michael Chaparro
guilty on three felony charges for viewing and transporting
child pornography. The charges arose from three crimes sep-
arated by significant gaps in time: viewing child pornography
on a hard drive in July 2013, transmitting child pornography
files over the Internet in August 2014, and viewing child por-
nography on a smartphone in November 2014. Chaparro was
sentenced to three concurrent prison terms of 210 months

each. On appeal he challenges his convictions on three distinct grounds: the sufficiency of the evidence that he was the person using the electronic devices; the admission at trial of a statement that he made to Pretrial Services; and allegedly improper remarks by the prosecutor during rebuttal.

The first and third challenges were not raised in the district court and provide no basis to disturb the convictions. Granted, the government's case could have been stronger as to the identity of the devices' user. The computer forensics led investigators to a home, not to an individual, and little evidence showed that Chaparro resided at the relevant street address before December 2014. Nevertheless, there was sufficient evidence to sustain the convictions on plain-error review. Any improper rebuttal comments did not affect Chaparro's substantial rights.

The admission of Chaparro's pretrial services statement was an error, though. When Congress created Pretrial Services, it made pretrial services information "confidential" and specifically prohibited its admission "on the issue of guilt in a criminal judicial proceeding." 18 U.S.C. § 3153(c)(1) & (3). This rule may protect some accused defendants, but its most important benefits accrue to the judicial system as a whole. Confidentiality helps pretrial services officers obtain the information needed to make quick and accurate recommendations about pretrial release and detention.

This case concerns a judge-made impeachment exception to Congress's mandate of confidentiality. In his pretrial interview, Chaparro had said that he lived at the scene of the crimes on all the relevant dates. The government left the record blank on that key point during its case in chief. Chaparro's lone witness, his uncle Eddie Ramos, then testified that

Chaparro did not live at the address until just before his ar-
rest. As rebuttal, the government sought to call the pretrial
services officer who interviewed Chaparro. The district court
allowed the testimony, over objection, relying on cases from
other circuits that have recognized an exception to pretrial
confidentiality for impeachment. See, e.g., *United States v.
Griffith*, 385 F.3d 124 (2d Cir. 2004).

Those precedents were inapposite, and it was a legal error
to admit Chaparro's statement to Pretrial Services. Chaparro's
words were not a prior inconsistent statement by Ramos, the
testifying witness. Instead, the government used them for
"impeachment by contradiction" against Ramos. Despite the
"impeachment" label, someone else's contradictory statement
is relevant *only* if it is offered for the truth of the matter as-
serted. The statement by Chaparro was thus offered as evi-
dence of guilt, a purpose specifically prohibited by statute.
This error was not harmless for two of the three convictions.
Considered for its truth, Chaparro's statement filled a key gap
in the government's cases on the July 2013 and August 2014
charges. Those convictions must therefore be vacated. Chap-
arro is entitled to a new trial on those charges or, in the alter-
native, to resentencing on the remaining conviction.

I.   *Sufficiency of the Evidence*

We first explain why the evidence was sufficient to sup-
port the jury's guilty verdicts on all three charges. Our review
on this question is limited to "plain error." Although Chap-
arro moved for a directed verdict under Rule 29 at the close of
the government's case, he failed to renew that motion at the
close of all the evidence. He thus forfeited his sufficiency chal-
lenge, and we review for a "manifest miscarriage of justice."
See *United States v. Clark*, 787 F.3d 451, 459 (7th Cir. 2015);

*United States v. Natale*, 719 F.3d 719, 743 (7th Cir. 2013); *United States v. Williams*, 298 F.3d 688, 692 (7th Cir. 2002). Under this standard, we will overturn the jury's verdict "only if 'the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking.'" *Natale*, 719 F.3d at 743, quoting *United States v. Turner*, 551 F.3d 657, 662 (7th Cir. 2008).

We begin with some background common to all charges. The investigation started in August 2014 when an undercover detective in Pennsylvania, Robert Erdely, recorded the Internet Protocol (IP) address of a computer transmitting child pornography to him over the Internet. The IP address corresponded to an AT&T account in the name of Eva Chaparro, the defendant's grandmother, with service at a home in McHenry, Illinois.[1] Based on Erdely's tip, Detective Michelle Asplund of the McHenry County Sheriff's Office executed a search warrant at the home on December 2, 2014. Accompanying her was Zeus Flores, a forensic computer examiner with the Illinois Attorney General's Office. When law enforcement arrived, only three people were in the house: Eva Chaparro, her husband Hector Chaparro—that is, the defendant's grandfather—and Eddie Ramos, the defendant's uncle.

Officers searched the home for computers and found two Gateway-brand laptops and a Compaq-brand desktop. Flores examined these computers on site and determined that the

---

[1] "IP addresses identify computers on the Internet, enabling data packets transmitted from other computers to reach them." *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 987 n.1 (2005). Erdely testified that "as someone connects to me on the Internet … I see his IP address," allowing Erdely "to find out who the customer is, at least the person paying the bill for that Internet service."

desktop's hard drive contained child pornography. During the search, Michael Chaparro arrived at the home. The officers seized an LG-brand smartphone from him. The smartphone could not be examined on site, but Flores later determined that it too had child pornography stored in its memory.

A grand jury indicted Michael Chaparro on three charges. Count One charged him with transporting child pornography over the Internet to Erdely in August 2014. Counts Two and Three charged him with accessing child pornography with intent to view it on the LG smartphone in November 2014 and on the Compaq desktop in July 2013. For clarity, we address the sufficiency of the evidence as to the charges in chronological order rather than the order in the indictment.

A. *Count Three – Accessing Material on the Hard Drive*

Count Three charged Chaparro with accessing an image of child pornography stored on the Compaq desktop's hard drive on July 30, 2013, in violation of 18 U.S.C. § 2252A(a)(5)(B). Chaparro concedes that the hard drive contained child pornography. He argues that the government failed to prove that he himself accessed any image on the hard drive or that there was a connection to interstate commerce.

The forensic evidence showed that someone used the hard drive to access child pornography on July 30, 2013. On the date of the search, December 2, 2014, Flores, the computer examiner, removed the hard drive from the Compaq desktop computer and analyzed it using special software. The desktop had not been powered on in over fifteen months, since August 24, 2013. But Flores was able to recover records of Internet searches for child pornography as well as images of child por-

nography from the drive. A user of the computer had down-loaded a video on July 30, 2013 titled, in part, "11Yo Pe-dofilia." System logs indicated that folders containing child pornography had been opened by a user. Chaparro does not dispute these points.

The record also included circumstantial evidence that Michael Chaparro was the user of the hard drive on July 30, 2013. Most directly, the Compaq desktop had a single user account named "M1KEY." In addition, the officers found the desktop in an upstairs bedroom, and evidence suggested that this bedroom belonged to Michael Chaparro—at least on the date of the search. Detective Asplund testified without objection that Eva Chaparro told her it was Michael's bedroom. Photographs of the room showed video-gaming equipment and sticks of men's deodorant, items one might expect in the room of a 26-year-old man rather than his grandmother. Another photograph showed a partially obscured coffee mug with the printed letters " … hael" visible.

On the other hand, Ramos testified that the room with the desktop computer was a "guest room/game room" and that Michael slept in a basement bedroom. Ramos also testified that the whole extended family, including his siblings, children, and grandchildren, stayed overnight at the house from time to time and used the computers. The jury was entitled to discount Ramos's testimony on these points. As the government said in closing, the messy upstairs room—bed unmade, half-empty water bottles on the dressers, video-gaming equipment strewn about—did not resemble a guest bedroom.

Granted, there was little evidence of *how long* Michael Chaparro had slept in the room with the desktop computer, or even how long he had lived at his grandparents' house. The

only direct evidence of Chaparro's past residency was his statement to Pretrial Services, admitted in the government's rebuttal case as purported "impeachment," that he lived with his grandparents from December 2011 to December 2014. As explained below, the district court should not have admitted that confidential statement because it provided substantive evidence of guilt. But "a reviewing court must consider all of the evidence admitted by the trial court when considering a sufficiency of the evidence challenge, regardless of whether that evidence was admitted erroneously." *United States v. Rahman*, 805 F.3d 822, 839 (7th Cir. 2015), citing *Lockhart v. Nelson*, 488 U.S. 33, 39 (1988). Applying this principle, the record was not "devoid of evidence pointing to guilt" as to the user of the hard drive. *Natale*, 719 F.3d at 743.

Chaparro also argues that the government offered no evidence that any image travelled through interstate commerce, a distinct basis for legal insufficiency. The statute defines the necessary connection to interstate commerce expansively: the image must have been "mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer" or "produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer." 18 U.S.C. § 2252A(a)(5)(B). The government presented evidence that satisfied both paths to meet this test. First, the images on the hard drive were downloaded from the Internet, so the Internet transported them. The Internet is a facility of interstate commerce. See *United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007) (explaining in Hobbs Act case that the Internet "crosses state and indeed international

boundaries"). Second, simply copying "computerized images" using "computer equipment" counts as "producing" the images under this provision. See *United States v. Anderson*, 280 F.3d 1121, 1125 (7th Cir. 2002). The hard drive was manufactured in China, so the images were "produced" using material transported in foreign commerce when they were copied onto the hard drive. The evidence was legally sufficient to convict Chaparro on Count Three.

B. *Count One – Transporting Material Through Interstate Commerce*

Count One charged Michael Chaparro with using the Internet to transport images of child pornography on August 7, 2014, in violation of 18 U.S.C. § 2252A(a)(1). The forensics are again undisputed. On that date, a device at the Chaparro home in Illinois sent child pornography to Erdely, the undercover Pennsylvania detective, over the Internet. The device specifically shared pieces of a "torrent" file named "817e." As explained at trial, the "BitTorrent" network allows anonymous users to combine multiple files and to share them with one another as one electronic package called a "torrent file." Torrent 817e contained specific child pornography images listed in the indictment.

Chaparro argues that there was insufficient evidence that he was the user who shared pieces of torrent 817e with Erdely. The device that transmitted to Erdely was never found, as the government admitted at trial. (Recall that the Compaq desktop was not powered on after August 2013, so it was not the device sharing child pornography on August 7, 2014.) Nevertheless, the record contained evidence that Michael Chaparro, and not some other user of the home's Internet connection,

shared torrent 817e in August 2014. First, the jury heard Chaparro's inadmissible statement to Pretrial Services that he lived at the home at that time. As noted, that statement must be considered in evaluating the sufficiency of the evidence.

In addition, two facts implied a single user of both the recovered hard drive and the unrecovered device that contacted Erdely. Forensic investigation revealed that pieces of 817e had also been downloaded to the recovered hard drive. And the August 2014 device gained access to the BitTorrent network using software called "Tixati," a rare program that Erdely had never encountered in hundreds of investigations. Tixati had also been installed on the recovered hard drive. These similarities were competent evidence, if not conclusive evidence, that one person committed both crimes. See Fed. R. Evid. 404(b) (evidence of other acts admissible to prove identity through *modus operandi*); *United States v. Gomez*, 763 F.3d 845, 854 (7th Cir. 2014) (en banc).

More generally, the evidence supporting the convictions for accessing child pornography was admissible on this charge to show that Chaparro had a propensity to transport child pornography. See Fed. R. Evid. 414(a) (evidence of any other child molestation crime "may be considered on any matter to which it is relevant"), 414(d)(2)(B) (defining "child molestation" to include all crimes under 18 U.S.C. § 2252A). The government made this argument in closing: "the Defendant is the one living in a room with a hard drive containing child pornography and a phone containing child pornography. The evidence shows that he was the one sharing child pornography from that IP address … ." Because propensity evidence was admissible, this argument was appropriate, and

the record was not "devoid of evidence" supporting a conviction on Count One.

C. *Count Two – Accessing Material on the Smartphone*

Count Two charged Chaparro with accessing child pornography stored on an LG-brand cellular telephone on November 24, 2014, in violation of 18 U.S.C. § 2252A(a)(5)(B). As with Count Three, Chaparro argues that the government failed to prove that he was the person who accessed the images on the telephone or that a specific image travelled through interstate commerce.

Again, the conduct and its connection to interstate commerce were amply supported. Forensic analysis of the smartphone showed that a user performed searches for terms related to child pornography on the morning of November 24, 2014. The smartphone had saved to its memory thumbnail versions of child pornography images that a user viewed that morning. The images arrived on the smartphone over the Internet, and the smartphone was manufactured in South Korea. These facts satisfied the interstate or foreign commerce element of the crime.

Sufficient evidence also showed that Chaparro was the user of the smartphone on November 24, 2014. Officers seized the device from him when he walked into the house during the search on December 2, eight days after the charged conduct. The smartphone's memory contained specific evidence that Chaparro was also using it on the date of the crime. A text message sent from the smartphone at 12:04 PM on November 24 read, "Hey alyssa its mike. Nick asked me to text ya." Two minutes earlier, a phone identified as "Nicksnew" had sent Alyssa's number to the smartphone. These messages imply

that Michael Chaparro was using the smartphone on November 24. The evidence was sufficient to sustain a guilty verdict on Count Two.

II. *Use of Statement to Pretrial Services to "Impeach by Contradiction"*

Chaparro next argues that the district court erred when it allowed the government to impeach his only witness, Eddie Ramos, using the statement that Chaparro himself had made to Pretrial Services. The Pretrial Services Act provides that information from pretrial interviews is "not admissible on the issue of guilt in a criminal proceeding" unless the charges stem from conduct relating to Pretrial Services. 18 U.S.C. § 3153(c)(3). The question is whether this provision allows one person's account to Pretrial Services to be admitted to impeach a different person at trial by "specific contradiction." No court of appeals has decided this issue before, although some have ruled that the government may impeach witnesses using *their own* statements to Pretrial Services. We conclude that the statute compels a different result here, especially when interpreted in light of established evidence doctrine. The admission of Chaparro's statement was an error. Its admission was harmless as to Count Two (the smartphone charge), but it was not harmless as to Counts One and Three.

A. *Admission at Trial*

We first summarize the proceedings in the district court that gave rise to this question. Just before the close of evidence, and without prior notice, the government called pretrial services officer James Wheatley as a rebuttal witness. Eddie Ramos had testified for the defense that Chaparro had lived with a girlfriend from Easter 2013 to Thanksgiving 2014.

Since that time span covered all the charged conduct, Ramos's testimony would have severely damaged the government's case if the jury had credited it. The government called Officer Wheatley, who would testify that Chaparro said in his pretrial interview that he had been living at that home "for three years prior to his arrest." Attempting to distinguish the "issue of guilt" statutory language, the government argued that it wished to use Chaparro's statement "for the purpose solely of impeaching Mr. Ramos." The prosecutor did not mention at that time Ramos's own statement to Pretrial Services.

Both the defense and Pretrial Services itself opposed having Officer Wheatley testify about what Chaparro had told him. The defense argued that Chaparro's statement would in fact go to "an issue of guilt" and more broadly that pretrial communications "are supposed to be confidential." Officer Wheatley, who was already present in court, had spoken with the chief of Pretrial Services and expressed "our position" that "information obtained in the bond report should not be used at trial." Officer Wheatley also cited confidentiality regulations promulgated by Pretrial Services that he believed barred his testimony. See 8A Guide to Judiciary Policy § 240 (Sept. 23, 2019), formerly 8A Guide to Judiciary Policy app. 5A (Dec. 28, 2010). The current version of the regulations is attached as an appendix to this opinion.[2]

The district court initially denied the government's request, ruling that the statute "shields the Pretrial Services officer from having to give this testimony." Minutes later, however, the court returned to the subject after discovering *United*

---

[2] It is also publicly available online: https://www.uscourts.gov/sites/default/files/guide-vol08a-ch02-sec240-confidentialityregs_0.pdf.

*States v. Griffith*, 385 F.3d 124 (2d Cir. 2004). That case held that "a defendant's statements to pretrial services are admissible against the defendant when used to impeach the defendant's credibility." *Id.* at 126. The district court acknowledged that Chaparro's case raised "the defendant's witness's credibility" instead of "the defendant's credibility," but decided *Griffith* was on point either way.

Officer Wheatley took the stand. Before his testimony began, the district court gave a limiting instruction to the jury: "the testimony that Mr. Wheatley may give you regarding *the Defendant's* statements may be considered by you only insofar as it may affect the credibility of Eddie Ramos and not for any other purpose." (Emphasis added.) Officer Wheatley then explained that he had interviewed Chaparro on March 3, 2016 to gather information for the bond report. Chaparro said that he "had lived with his grandparents from approximately December of 2011 to December of 2014" and did not mention living anywhere else. In a brief cross-examination, Officer Wheatley acknowledged that he could not "say with 100 percent certainty" that every defendant tells "the 100 percent correct truth" to Pretrial Services.

During redirect examination, the government without warning asked Wheatley instead about statements *Ramos* had made to Wheatley. The defense did not object to this expansion during redirect. Officer Wheatley testified that he had sought to verify Chaparro's residence by interviewing Ramos, whom Chaparro had named as a family member to contact. Wheatley said that "Ramos confirmed what the defendant had told me," namely that Chaparro "lived with his grandparents" from "December 2011 to December 2014."

After Officer Wheatley left the stand, the government raised the issue of adding a jury instruction given the redirect testimony: "the [original] instruction that we tendered to the court is *impeachment by contradiction*. What the redirect brought out from Mr. Wheatley was that Mr. Ramos made a *prior inconsistent statement*." (Emphasis added.) The government gave the court a new jury instruction it had already prepared, and the defense did not object. The new instruction as given to the jury read: "You have heard evidence that before the trial, *Eddie Ramos* made a statement that may be inconsistent with his testimony here in court. You may consider an *inconsistent statement* made before the trial only to help you decide how believable his testimony was here in court." (Emphasis added.)

Thus, although the court had explicitly ruled on the admission of only *Chaparro's* statement to Pretrial Services, the jury also heard evidence of *Ramos's* statement to Pretrial Services. Confounding matters further, during the government's closing arguments, the prosecutor cited Chaparro's statement to Officer Wheatley—not Ramos's—as proof that Ramos was "a desperate liar." On appeal, Chaparro challenges the admission only of his own statement; he emphasizes that he does not appeal the admission of Ramos's, which would fall within the *Griffith* exception for impeachment. See Reply Br. at 4–6.

B. *The Evidentiary Error*

We review an evidentiary ruling for an abuse of discretion. E.g., *United States v. Driggers*, 913 F.3d 655, 658 (7th Cir. 2019). We review questions of statutory interpretation de novo, however. E.g., *Nielen-Thomas v. Concorde Inv. Servs., LLC*, 914 F.3d 524, 527 (7th Cir. 2019). And a legal error is "an abuse of discretion by definition." *Abu-Shawish v. United States*, 898

F.3d 726, 736 (7th Cir. 2018). Using a defendant's statements to Pretrial Services to impeach a witness other than the defendant by "specific contradiction" violates the confidentiality protections that Congress enacted. The district court made a legal error and thus abused its discretion when it allowed the government to use Chaparro's confidential statement to impeach Ramos.

1. *The Statute and Implementing Regulations*

We begin with the text of the Pretrial Services Act of 1982, which established pretrial services agencies in each judicial district and specified their functions and powers. See Pub. L. No. 97-267, 96 Stat. 1136 (1982) (codified as amended at 18 U.S.C. §§ 3152–3155). Section 3153(c)(1) establishes a baseline rule that pretrial services information should remain confidential: "Except as provided in paragraph (2) of this subsection, information obtained in the course of performing pretrial services functions in relation to a particular accused shall be used only for the purpose of a bail determination and shall otherwise be confidential." 18 U.S.C. § 3153(c)(1). Paragraph (2) then directs Pretrial Services to issue regulations creating five exceptions to the confidentiality bar, none of which applies to this case. See § 3153(c)(2); see also 8A Guide to Judiciary Policy § 240.20.30(b) (regulations promulgated under paragraph (2)).

This case instead concerns the third and final paragraph of the subsection, which adds a further caveat:

> Information made confidential under paragraph (1) of this subsection is not admissible *on the issue of guilt* in a criminal judicial proceeding unless such proceeding is a prosecution for a

crime committed in the course of obtaining pre-
trial release or a prosecution for failure to ap-
pear for the criminal judicial proceeding with
respect to which pretrial services were pro-
vided.

18 U.S.C. § 3153(c)(3) (emphasis added). Under this provision,
Chaparro's statement was not admissible "on the issue of
guilt" in his trial. The Eleventh Circuit, for example, has held
that allowing a pretrial services officer to identify the defend-
ant's voice went to the issue of guilt and thus violated the Act.
See *United States v. Perez*, 473 F.3d 1147, 1151–52 (11th Cir.
2006) (nevertheless affirming on plain-error review).

The pretrial confidentiality mandated by Congress is de-
signed to help judges make prompt, accurate, and lawful pre-
trial release decisions. A core duty of Pretrial Services is to
"[c]ollect, verify, and report to the judicial officer, prior to the
pretrial release hearing, information pertaining to the pretrial
release of each individual charged with an offense." 18 U.S.C.
§ 3154(1). Judges rely on these reports when deciding whether
to release defendants pending trial under the Bail Reform Act,
§ 3142. See, e.g., *United States v. Mundy*, No. 4:19-cr-00018-
TWP-VTW, 2019 WL 3729318, at *1, *3 (S.D. Ind. Aug. 8, 2019);
*United States v. Gaunt*, No. 1:18-cr-70-TLS, 2018 WL 5993885,
at *3 (N.D. Ind. Nov. 15, 2018); *United States v. Khan*, No. 1:15-
cr-00286, 2015 WL 4475537, at *4 (N.D. Ill. July 21, 2015).

Pretrial services officers often do not receive investigative
assignments until the defendant is arrested. They must pre-
pare their reports "*in only a few hours*," according to a former
Chief Pretrial Services Officer for the District of Nevada. See
James R. Marsh, *Performing Pretrial Services: A Challenge in the
Federal Criminal Justice System*, Fed. Probation, Dec. 1994, at 3.

Chaparro's case illustrates the required haste. He was indicted on March 1, 2016; Officer Wheatley prepared an initial report on March 2; Chaparro was arraigned on March 3; that same day, Officer Wheatley interviewed Chaparro and Ramos and prepared an addendum report. The magistrate judge ordered Chaparro released on bond on March 7.

Pretrial confidentiality is essential to the reliability of this rapid process. It would obviously discourage prompt and candid interviews if defendants' statements could later be used to prove their guilt. Both the Senate and House Conference reports on the Act stressed this concern. The Senate Report said that pretrial information "should be confidential and only be used for a bail determination" in order "to promote candor and truthfulness by the defendant in bail interviews." S. Rep. No. 97-77, at 12 (1981). The House Conference Report explained that the goal of § 3153(c)(3) was to obtain accurate information for the courts: "the limitation on admissibility is necessary to further the objective of ensuring that the court receives the most complete information possible." H.R. Rep. No. 97-792, at 9 (1982) (Conf. Rep.).

Practical experience has justified Congress's concerns. In the article cited above, Chief Officer Marsh noted that some defense attorneys were "advising their clients not to answer certain questions posed to them by pretrial services officers or interview at all." Marsh, supra, at 4. In 2005—the last year for which such data are available—12.1 percent of defendants nationwide refused to be interviewed. See Admin. Office of the U.S. Courts, Judicial Business Table H-2: Interviews and Types of Pretrial Services Reports (2005).[3] This fact shows that

---

[3] Available online at https://www.uscourts.gov/statistics-reports/judicial-business-2005. "Judicial notice of historical documents, documents

a non-trivial minority of defendants already perceive danger in cooperating with Pretrial Services. An overly permissive reading of § 3153(c)(3) would likely corroborate these fears and interfere with the proper operation of the courts in pretrial release and detention decisions. The regulations promulgated by Pretrial Services make this same point: "The disclosure of pretrial services information for purposes other than determining pretrial release, particularly for prosecution purposes, would deter a person from cooperating with an officer and deprive the court of necessary information." 8A Guide to Judiciary Policy § 240.10(b).[4]

Emphasizing the importance of this issue, the reliability of pretrial release decisions has a constitutional dimension. To comply with the Due Process Clause, pretrial detention authorized by the Bail Reform Act must be "regulatory, not penal." *United States v. Salerno*, 481 U.S. 739, 746 (1987). In upholding the Act, the Supreme Court underlined its reliability safeguards: "the procedures by which a judicial officer evaluates the likelihood of future dangerousness are specifically

---

contained in the public record, and reports of administrative bodies is proper." *Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998).

[4] Because Pretrial Services is an arm of the judiciary within the Administrative Office of the U.S. Courts, see 18 U.S.C. § 3152(a), regulations it promulgates do not receive *Chevron* deference in the traditional sense. See *Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("We have long recognized that considerable weight should be accorded to *an executive department's* construction of a statutory scheme it is entrusted to administer … ." (emphasis added)). Nevertheless, Pretrial Services had a congressional mandate to issue the confidentiality regulations, and we give them due respect as the views of the office tasked with a crucial function for the courts.

designed to further the accuracy of that determination." *Id.* at 751. Pretrial confidentiality promotes this important aim.

In light of the strong policy favoring confidentiality of pretrial services information, we note the procedure district courts should follow when asked to order its disclosure. Judges may certainly order disclosure permitted by the Act in appropriate circumstances. The pretrial services regulations recognize this power, allowing officers to disclose pretrial information if "authorized by confidentiality regulations *or directed by a judge for good cause shown*." 8A Guide to Judiciary Policy § 240.20.20(a) (emphasis added). In this case, none of the authorized exceptions was relevant. See § 240.20.30 (listing fourteen categories of authorized disclosures). Officer Wheatley thus refused to testify at Chaparro's trial until the court ordered him to do so.

District courts should exercise this power in accordance with the pretrial services regulations and any relevant local rules. The regulations specify factors for a judge to consider before finding good cause for disclosure: (1) any promise of confidentiality made to the information's source; (2) any harm the disclosure might cause; (3) the overall policy in favor of confidentiality; and (4) the purpose of the disclosure. § 240.20.30(i). The regulations also direct generally that any disclosure "be limited to the minimum information necessary to carry out the purpose of the disclosure." § 240.20.30. The local rules of the district court in this case similarly require any disclosure to be supported by good cause and to be no broader than necessary to accomplish its purpose. See N.D. Ill. Local Crim. R. 46.4(b)(1) & (d). Even without a controlling local rule, those are sensible standards.

Here, the district judge neither found that the government had shown good cause to introduce the pretrial services statements nor limited Officer Wheatley's testimony to the minimum information necessary for impeachment. Granted, not every departure from the regulations and local rules necessarily violates the Pretrial Services Act. But district courts can minimize the risk of erroneously admitting evidence by requiring litigants to show good cause for disclosure in the first place. See, e.g., *United States v. Mbirika*, No. 1:12-cr-00602-PKC, 2013 WL 5295195, at *2–3 (S.D.N.Y. Sept. 16, 2013) (finding government failed to show good cause after considering "(1) the kind and character of the information sought, (2) the stated need for the information and (3) the availability of comparable information from other sources"). Such an inquiry might have led the district court to limit Officer Wheatley's testimony and prevented this statutory dispute. At this stage, however, our task is to evaluate whether the admission of Chaparro's statement violated the Act.

2. *An Implied Impeachment Exception to Pretrial Confidentiality*

We thus return to the "issue of guilt" language in 18 U.S.C. § 3153(c)(3). Five circuits have held that, because the Act specifically bars pretrial services evidence "on the issue of guilt," it implicitly permits such evidence for impeachment purposes. See *United States v. Ackies*, 918 F.3d 190, 206 (1st Cir. 2019); *United States v. Griffith*, 385 F.3d 124, 126 (2d Cir. 2004); *United States v. Stevens*, 935 F.2d 1380, 1393–97 (3d Cir. 1991); *United States v. Wilson*, 930 F.2d 616, 619 (8th Cir. 1991); *United*

*States v. De La Torre*, 599 F.3d 1198, 1205 (10th Cir. 2010).[5] These decisions cite the traditional distinction between guilt and impeachment evidence and then apply the canon that "the expression of one thing suggests the exclusion of others." *Exelon Generation Co., LLC v. Local 15, Int'l Bhd. of Elec. Workers*, 676 F.3d 566, 571 (7th Cir. 2012) (in Latin, "*expressio unius est exclusio alterius*"). Paragraph (1) of § 3153(c) makes strict confidentiality the norm, but paragraph (3) adds a specific prohibition against admitting pretrial information as guilt evidence. The prior decisions concluded that Congress thus implied an exception for impeachment evidence. See *Griffith*, 385 F.3d at 126; *Stevens*, 935 F.2d at 1395; *Wilson*, 930 F.2d at 619.

We have not interpreted § 3153(c) before, but we reached an analogous result under a similar statute that barred evidence from mental competency examinations "on the issue of guilt in any criminal proceeding." *United States v. Castenada*, 555 F.2d 605, 608 (7th Cir. 1977), quoting 18 U.S.C. § 4244 (1976). There, we allowed the impeachment of a testifying defendant using statements he had made to a government psychiatrist because they were "offered by the Government on the limited issue of credibility rather than on the issue of guilt." *Id.* at 609. Our reasoning in *Castenada* comports with other circuits' analyses of the Pretrial Services Act.

As for the pretrial services regulations, no provision mentions the implied impeachment exception, either to endorse or disparage it. The subsection on the use of pretrial services information in prosecutions merely repeats the language of the Act, including the "issue of guilt" proviso. 8A Guide to

---

[5] See also *United States v. Balogun*, 463 Fed. Appx. 476, 483 (6th Cir. 2012) (same).

Judiciary Policy § 240.20.30(j). As noted above, a general "good cause" exception recognizes that district judges may order the disclosure of information after considering, among other factors, "the purpose of the disclosure." § 240.20.30(i). The good cause provision could embrace an impeachment exception in some form.

That said, any negative inference carries risk. We cannot be certain which concepts, if any, Congress was contrasting with the language it included. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012) (negative-implication doctrine properly applies "only when the *unius* (or technically, *unum*, the thing specified) can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved"); see also *Alto Dairy v. Veneman*, 336 F.3d 560, 566 (7th Cir. 2003) ("omissions are not enactments; and even deliberate omissions are often subject to alternative interpretations"). Here, an alternative explanation for the "issue of guilt" proviso in § 3153(c)(3) is that Congress was exempting sentencing decisions. Indeed, the previous paragraph expressly authorizes the release of pretrial services information "for the purpose of compiling presentence reports." 18 U.S.C. § 3153(c)(2)(C); see *United States v. Morrison*, 778 F.3d 396, 400 (2d Cir. 2015) (holding that this provision permits pretrial services information at sentencing). This ready alternative, alongside the clear textual directive against disclosure, casts some doubt on the inference that the statute does not apply to impeachment.

But we need not resolve that issue here. For purposes of this case, we assume without deciding that Congress intended to create the impeachment exception found by other circuits. Chaparro himself does not contest the existence of an

impeachment exception. He disputes only its scope. We must classify use of his statement as either guilt or impeachment evidence, so we turn to impeachment doctrine.

### 3. *Specific Contradiction Distinguished from Other Methods of Impeachment*

There are five general methods to impeach a witness: (1) attacking character for truthfulness; (2) introducing a prior inconsistent statement; (3) establishing bias; (4) showing impaired capacity to perceive, recall, or relate the events in question; and (5) contradicting the substance of the testimony. See *United States v. Lindemann*, 85 F.3d 1232, 1243 (7th Cir. 1996), citing Charles Alan Wright & Victor James Gold, 27 Federal Practice and Procedure: Evidence § 6094 (1990); see also 4 Mark S. Brodin et al., Weinstein's Federal Evidence §§ 607.04–.08 (2d ed. 2018) (listing same five methods). In this case, we are concerned with methods (2) and (5): prior inconsistent statements and specific contradiction. Only prior inconsistent statements differ meaningfully from guilt evidence, and that point of law shows the error here.

Nearly every case recognizing an impeachment exception to pretrial services confidentiality approved impeaching a witness by *his or her own* prior inconsistent statements to Pretrial Services—method (2). See *Ackies*, 918 F.3d at 206 (statement of defense witness); *Griffith*, 385 F.3d at 125 (statement of testifying defendant); *Stevens*, 935 F.3d at 1393 (statement of defense witness); *United States v. Hernandez-Espinoza*, 890 F.3d 743, 746 (8th Cir. 2018) (statement of defendant at sentencing); *United States v. Issaghoolian*, 42 F.3d 1175, 1177 (8th Cir. 1994) (statement of testifying defendant); *Wilson*, 930 F.2d at 619 (statement of testifying defendant); *De La Torre*, 599

F.3d at 1205 (statement of testifying defendant); see also *Caste-nada*, 555 F.2d at 608–09 (statement of testifying defendant).[6] In the only case that did not involve inconsistent statements, the defendant had told a pretrial services officer that he was a "hustler." This was held admissible to show his lack of character for truthfulness—method (1). See *United States v. Smith*, 973 F.2d 1374, 1378–79 (8th Cir. 1992).

Impeachment by inconsistent statements attacks the general credibility of a witness rather than the substantive truth of specific testimony. "There is a crucial distinction between the use of a prior inconsistent statement of a witness only to impeach the credibility of the witness and its use to prove as a fact what is contained in the statement." *United States v. Dietrich*, 854 F.2d 1056, 1062 n.5 (7th Cir. 1988), quoting *United States v. Ragghianti*, 560 F.2d 1376, 1381 (9th Cir. 1977). The critical point is this: a prior inconsistent statement casts doubt on a witness's reliability *no matter which version, if either, is true*. "The attack by prior inconsistent statement is *not based on the theory that the present testimony is false and the former statement true*. Rather, the theory is that talking one way on the stand and another way previously is blowing hot and cold, raising a doubt as to the truthfulness of *both statements*." 1 Kenneth S. Brown et al., McCormick on Evidence § 34, at 209 (7th ed. 2013) (emphasis added). Federal Rule of Evidence 613(b) thus allows admission of a prior inconsistent statement for impeachment even if the statement would be inadmissible for its

---

[6] See also *Balogun*, 463 Fed. Appx. at 483 (statement of testifying defendant).

truth. See *United States v. Severson*, 49 F.3d 268, 272 (7th Cir. 1995).[7]

The impeachment at issue in Chaparro's case was different. The district court allowed the admission of two pretrial services statements, one by Chaparro and the other by Ramos. Ramos's was a prior inconsistent statement: whether or not Ramos told the truth to Officer Wheatley, the fact that he said different things at different times undermined his credibility. As the government noted at trial, however, the admission of Chaparro's statement instead constituted "impeachment by contradiction." It undermined "the substance of [Ramos's] testimony"—method (5) in *Lindemann*, 85 F.3d at 1243—by showing that someone else had said something different.

Chaparro rightly challenges this latter technique. To be sure, introducing contradictory extrinsic evidence is a recognized method of impeachment. See *United States v. Kozinski*, 16 F.3d 795, 805 (7th Cir. 1994) ("Impeachment by contradiction is a valid method of impeachment and 'simply involves presenting evidence that part or all of a witness' testimony is incorrect.'"), quoting *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 604 (7th Cir. 1985). Although not expressly mentioned in

---

[7] The same observation applies to most other instances of impeachment. Evidence regarding a witness's lack of character for truthfulness, bias, or impaired capacity usually does not implicate substantive issues in the case, so the line between guilt and impeachment is easy to draw. In fact, the very concept of "impeachment" is commonly defined in terms of the distinction between credibility and substantive truth. See *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993) ("Substantive evidence is that which is offered to establish the truth of a matter to be determined by the trier of fact … . Impeachment evidence, on the other hand, is that which is offered to discredit a witness … ." (quotation marks omitted)).

the Federal Rules of Evidence, "impeachment by contradic-
tion" existed at common law and "can be inferred from the
relevance rules and Rule 607." Charles Alan Wright & Victor
James Gold, 27 Federal Practice and Procedure: Evidence
§ 6096, at 655 (2d ed. 2007); cf. *United States v. Abel*, 469 U.S.
45, 51 (1984) (reaching analogous conclusion regarding the le-
gal foundation of bias impeachment).

Notwithstanding its name, impeachment by contradic-
tion—also called "specific contradiction," 1 Broun, McCor-
mick on Evidence § 45—differs in a fundamental respect from
most other impeachment: it seeks to establish substantive
facts. See *United States v. Boswell*, 772 F.3d 469, 476 (7th Cir.
2014) (impeachment by contradiction "involves presenting
evidence that the *substance* of a witness's testimony is not to
be believed" (emphasis added)). The problem is that contrary
substantive evidence can "impeach" only if the jury accepts it
as substantively true. That characteristic undermines the
guilt-impeachment distinction for our purposes.[8]

A story from American legal lore illustrates this point. In
1858, Abraham Lincoln defended William "Duff" Armstrong,
a man accused of murder in Beardstown, Illinois. See Irving
Younger et al., Principles of Evidence 12–14 (5th ed. 2007). The
prosecution's key witness testified that he saw the killing by

---

[8] The guilt-impeachment line can blur in other situations as well. For
instance, the use of prior convictions to impeach a defendant's character
for truthfulness under Rule 609 can verge on impermissible propensity
evidence. See generally *United States v. Thomas*, 933 F.3d 685, 690 (7th Cir.
2019) (Rules 404 and 609 are meant to "ensure that a defendant is con-
victed based on the evidence relevant to the charged offenses, not a sup-
posed propensity to commit crimes"). We do not speculate on other cases
that might raise similar issues under the Pretrial Services Act.

the light of a full moon high overhead. *Id.* at 13. Lincoln impeached the witness by contradiction. He famously used an almanac that reported a quarter-moon below the horizon at the alleged time of the murder. *Id.*; see also 2 John Henry Wigmore, Evidence in Trials at Common Law § 1000, at 1156 (1904) (giving this story as example of impeachment by contradiction). Armstrong was acquitted. Note, however, that if the lunar tables in the almanac had been inaccurate, they would not have cast any doubt on the witness's testimony. Their effect depended on their truth.[9]

The Lincoln example shows that specific contradiction, rather than targeting a witness's credibility, merely adds contrary evidence to the record. So "impeachment by contradiction" is a bit of a misnomer, at least using the normal definition of impeachment that contrasts it with substantive evidence. This point has long been recognized. In the original 1904 edition of his now-canonical treatise, Dean Wigmore explained that specific contradiction presents substantive evidence in another guise. His analysis merits quoting at length:

> [C]ontradiction in itself does nothing probatively, no[t] unless the contradicting witness or witnesses are believed in preference to the first one, *i. e.* unless *his error* is established. It is not the contradiction, but the truth of the contradicting assertion as opposed to the first one, that constitutes the probative end. Nevertheless, the

---

[9] In a different account, the witness reported a three-quarters moon, not a full moon. See John Evangelist Walsh, Moonlight: Abraham Lincoln and the Almanac Trial 52–55 (2000). In John Ford's version, Henry Fonda induces the witness not only to recant his testimony but also to confess on the stand. See Young Mr. Lincoln (Cosmopolitan Productions 1939).

> contradiction, being the usual and prominent
> feature of the process by which that end is
> aimed at, has served as the common name to
> designate the probative end itself. This is not
> wrong, provided it be clearly understood what
> that end is.

2 Wigmore, Evidence § 1000, at 1157.[10]

Wigmore's advice to keep clear "what the probative end is" guides us here. The government introduced Chaparro's pretrial services statement that he had been living with his grandparents precisely because it contradicted Ramos's testimony on a key fact. The power of Chaparro's statement to "impeach" Ramos *depended on its truth*—just as Wigmore explained. Yet the Pretrial Services Act barred admitting Wheatley's testimony for its truth. Chaparro's residency at the relevant times was central to the government's case, so the testimony went to an "issue of guilt" under the Act. 18 U.S.C. § 3153(c)(3); see *United States v. Perez*, 473 F.3d 1147, 1151 (11th Cir. 2006) (evidence implicated "the issue of guilt" because it tended "to prove that [the defendant] had been involved in the drug transactions for which he was charged"). Admitting the statement violated the Act. Assuming an exception exists under § 3153(c)(3) for other forms of impeachment, applying

---

[10] For a more recent articulation of the same point, see James L. Kainen, *The Impeachment Exception to the Exclusionary Rules: Policies, Principles, and Politics*, 44 Stan. L. Rev. 1301, 1331 (1992) (in the hearsay context, "impeachment proof is distinguished from substantive proof by its ability to reflect on the credibility of a witness's testimony, regardless of the 'truth of the matter asserted' by the evidence. In this context, therefore, impeachment-by-contradiction proof would be excluded from the rubric of impeachment.").

that exception to include specific contradiction by a statement from someone other than the witness is contrary to the confidentiality protections Congress enacted.[11]

> 4. *Comparisons to Other Areas of Law that Distinguish Guilt from Impeachment*

The line we draw is consistent with the lines of precedent from which other circuits have drawn to allow use of a witness's statement to Pretrial Services to impeach his or her own testimony: (1) evidence suppressed under the Fourth, Fifth, and Sixth Amendments; and (2) grand jury testimony. Both categories of normally inadmissible evidence are subject to impeachment exceptions. But for both categories, only a witness's own statements—not some other person's contradictory account—can be used to impeach him or her at trial.

To begin with exclusionary rules, evidence suppressed to remedy a constitutional violation can still be introduced to impeach a testifying defendant's credibility. See, e.g., *Michigan v. Harvey*, 494 U.S. 344, 349–51 (1990) (statement by defendant procured through Sixth Amendment violation); *United States v. Havens*, 446 U.S. 620, 626–28 (1980) (evidence suppressed as the fruit of an illegal search); *Oregon v. Hass*, 420 U.S. 714, 721–22 (1975) (statement by defendant procured through Fifth Amendment violation). But the Supreme Court

---

[11] Our analysis is consistent with the collateral evidence rule on impeachment. "[I]f a matter is collateral (that is, if it could not be introduced into evidence as substantive proof) then it cannot be proven simply to contradict the witness' testimony for impeachment purposes." *Simmons*, 762 F.2d at 604–05. "To put it another way, 'one may not contradict for the sake of contradiction; the evidence must have an independent purpose and *an independent ground for admission*.'" *United States v. Payne*, 102 F.3d 289, 294 (7th Cir. 1996) (emphasis added), quoting *Kozinski*, 16 F.3d at 806.

has limited the scope of this impeachment exception to testifying defendants; other defense witnesses cannot be impeached with suppressed evidence. See *James v. Illinois*, 493 U.S. 307, 313 (1990). "Expanding the class of impeachable witnesses from the defendant alone to all defense witnesses," the Court explained, "would not promote the truthseeking function to the same extent as did creation of the original exception, and yet it would significantly undermine the deterrent effect of the general exclusionary rule." *Id.* at 313–14.

The rules for grand jury testimony are similar. The general rule is that grand jury testimony is secret and cannot be used in a later trial. See Fed. R. Crim. P. 6(e)(2); *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 (1958) (noting "long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts"). But if a witness at trial gave inconsistent testimony to a grand jury, that testimony may be admitted against the witness. See *United States v. Handlin*, 366 F.3d 584, 592 (7th Cir. 2004) (testifying defendant); *United States v. Cooper*, 767 F.3d 721, 728 (7th Cir. 2014) (defense witness). In fact, due to the rule that sworn prior inconsistent statements are not hearsay, a witness's conflicting grand jury testimony can often be admitted not only for impeachment but also as substantive proof. See Fed. R. Evid. 801(d)(1)(A); *Cooper*, 767 F.3d at 728. That result depends, however, on the same witness testifying both before the grand jury and at trial. We are aware of no authority permitting "impeachment by contradiction" of a witness using someone else's grand jury testimony.

The comparisons to constitutional violations and grand jury testimony thus reinforce our conclusion that Chaparro's

confidential statement to Pretrial Services could not be introduced to impeach Ramos.

C. *Harmless Error?*

Improper admission of evidence does not call for reversal if the error was harmless. The general test for harmless error at trial is whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Bonin*, 932 F.3d 523, 538 (7th Cir. 2019), quoting *Neder v. United States*, 527 U.S. 1, 18 (1999). For an incorrect evidentiary ruling, "we consider 'whether the prosecution's case would have been significantly less persuasive in the mind of the average juror if the erroneously admitted evidence had been excluded.'" *United States v. Williams*, 900 F.3d 486, 489 (7th Cir. 2018), quoting *United States v. Saunders*, 826 F.3d 363, 370 (7th Cir. 2016). We will affirm if "the error had no substantial influence on the verdict" because "other untainted incriminating evidence is overwhelming." *United States v. Zuniga*, 767 F.3d 712, 717 (7th Cir. 2014), quoting *United States v. Dominguez*, 992 F.2d 678, 681 (7th Cir. 1993).

Chaparro presents two distinct theories of the harm caused by the admission of his statement to Officer Wheatley. First, he argues, his statement undermined the credibility of Ramos, his only witness, who had given testimony that tended to exonerate Chaparro on several fronts. We reject this theory. Chaparro challenges the admission only of his own statement, but the jury heard an identical statement made by Ramos. The final jury instructions mentioned only Ramos's prior inconsistent statement, not the "impeachment by contradiction" via Chaparro. For impeaching Ramos, Chaparro's statement to Officer Wheatley was cumulative. "As a general

rule, errors in admitting evidence that is merely cumulative of properly admitted evidence are harmless." *Jordan v. Binns*, 712 F.3d 1123, 1138 (7th Cir. 2013). We are satisfied that excluding Chaparro's statement would not have made Ramos any more credible to the average juror.

Second, Chaparro argues that there is a risk that the jury considered his statement as substantive evidence of guilt, notwithstanding the limiting instruction, and that in this role his admission bolstered the government's case in chief. This theory abandons Ramos's testimony and refocuses on a weakness in the government's case noted above: the lack of any direct evidence that Chaparro lived at his grandparents' home in the years before the search on December 2, 2014. To evaluate whether Chaparro's statement had a "substantial influence on the verdict" by this mechanism, *Zuniga*, 767 F.3d at 717, we must assess two nested risks: (1) whether the jury considered Officer Wheatley's testimony on direct examination for its truth; and (2) whether the testimony had a substantial influence on the verdict.

The logic of impeachment by contradiction answers the first question in Chaparro's favor. Granted, we start from the presumption that juries heed limiting instructions: though it may be a "fiction," the "usual view" is that "limiting instructions cure everything." *United States v. Myers*, 892 F.2d 642, 645 (7th Cir. 1990). We have made clear, however, that this presumption is rebuttable. See, e.g., *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 834 (7th Cir. 2016) ("*Absent indications to the contrary*, we presume that juries heed limiting instructions." (emphasis added)), citing *United States v. Mallett*, 496 F.3d 798, 802 (7th Cir. 2007).

The presumption is rebutted here because the limiting instruction did not even make sense as applied to Chaparro's own statement to Pretrial Services. The power of specific contradiction evidence depends on the jury's accepting its truth. See above at 26–28; *Kozinski*, 16 F.3d at 805; 2 Wigmore, Evidence § 1000, at 1157. That is why Chaparro's statement went to an "issue of guilt" under the Pretrial Services Act. Unless the jury believed Chaparro's statement that he lived with his grandparents on the relevant dates, what doubt could it possibly have cast on Ramos's contrary testimony?

We have great confidence in jurors, but we cannot fairly expect them to obey contradictory or illogical instructions. The jury was told to consider as "impeachment" evidence a statement that was probative only if it was true, but also to disregard the truth of the statement. That's too much to ask. No matter how diligent and attentive, the jury simply "could not follow the court's limiting instruction" and still treat Chaparro's statement as relevant. See *Mallett*, 496 F.3d at 802. There is a substantial risk that the jury considered Officer Wheatley's testimony on direct examination as guilt evidence.

The second, more fact-specific question is whether the government's case would have been "significantly less persuasive in the mind of the average juror" without Chaparro's statement that he lived at the scene of the crime on all the relevant dates. *Williams*, 900 F.3d at 489. The statement amounted to an admission by the defendant—a defendant who had exercised his constitutional right to remain silent—to a crucial fact for the government on two of the three charges.

In particular, Chaparro admitted that he lived at his grandparents' home on July 30, 2013, the date that someone

viewed child pornography on the hard drive, as charged in Count Three of the indictment. The police did not search the Chaparro home until over sixteen months later, in December 2014, at which point that desktop computer had not been powered on for over fifteen months. As summarized above, there was plenty of evidence that Michael Chaparro was living in the bedroom with the desktop computer on the date of the search. Eva Chaparro told Asplund the room was his, and it contained a coffee mug labeled " … hael." Michael Chaparro showed up at the house while police were still there.

But the government needed to show that Chaparro was the hard drive's user on July 30, 2013. The record contained no evidence, other than Chaparro's inadmissible statement, that he lived at his grandparents' home in the summer of 2013. Detective Asplund testified that she learned shortly before the search that "an older couple" and "possibly two or three other individuals" might live at the house. She also testified that "you never really know who lives in a house until you get in there and ask who lives there," conceding that she could not say whether Chaparro lived at the house before the search. The government submitted no public records or anything else to prove where Chaparro lived in the prior months and years. The only admissible record evidence arguably probative of Chaparro's residency sixteen months prior appears to have been the desktop's user account name, "M1KEY." That does suggest that Chaparro at least configured the computer at some point, but it does not place him in the home at any particular time. Given the government's weak case on this point, Chaparro's admission of his residency, considered for its truth, substantially strengthened the inference that he was the user of the hard drive.

Chaparro also admitted to Officer Wheatley that he lived at his grandparents' home on August 7, 2014, the date that someone at the house sent child pornography over the Internet to Erdely, as charged in Count One. Although this crime was closer in time to the search—four months prior—the government again presented no specific evidence that Chaparro lived at his grandparents' home at that time. As the defense elicited on cross examination, Detective Erdely did not have "any idea" who was present in the Chaparro home in early August 2014. The computer that sent pornography to Erdely was never recovered, so the government could present no direct evidence of who used it. True, we concluded above that the government presented sufficient evidence to sustain the conviction on Count One on plain error review. But we relied on the erroneously admitted pretrial services statement, specific similarities between the conduct charged in Counts One and Three, and the propensity evidence allowed under Rule 414. See above at 8–10. The untainted evidence for Count One, without a conviction on Count Three, was perhaps not even sufficient, let alone "overwhelming." *Zuniga*, 767 F.3d at 717. Here, too, Chaparro's admission of his residency helped the government's case significantly.

Even if considered for its truth, however, Chaparro's statement to Wheatley would not have had a substantial influence on the verdict for viewing child pornography on the smartphone. The smartphone conviction did not depend on Chaparro's living anywhere in particular. Officers seized the smartphone from him when he walked into the house during the search. The smartphone's user had viewed child pornography just eight days earlier and had identified himself in a text message that day as "mike." On Count Two, residence was not particularly relevant. The exclusion of Chaparro's

statement to Wheatley would not have made the government's case on County Two "significantly less persuasive" to the average juror. *Williams*, 900 F.3d at 489. The error was harmless as to that conviction.

Chaparro's admission to Officer Wheatley provided by far the best evidence of his presence at the scene of the crimes in Counts One and Three. There is at least a reasonable doubt whether, without the erroneous admission, the jury would have found Chaparro guilty as to those charges. Those convictions must be reversed.

III. *The Government's Rebuttal Argument*

Chaparro's final argument is that improper comments by the government during its closing rebuttal require a new trial. Because the conviction as to Count Two remains intact, we must address this argument as well. Chaparro did not object to any of the statements he now challenges on appeal, so our review is for plain error. In this context, plain error requires a defendant to "demonstrate that the comments at issue were 'obviously' or 'clearly' improper … [such] that not only was [he] deprived of a fair trial, but also that the outcome of the trial probably would have been different absent the prosecution's remarks." *United States v. Kelerchian*, 937 F.3d 895, 917 (7th Cir. 2019) (alterations in original), quoting *United States v. Hills*, 618 F.3d 619, 640 (7th Cir. 2010). "An error is not plain unless it is of such an obvious nature that the trial judge and prosecutor were 'derelict in countenancing' it, even absent the defendant's timely objection." *United States v. Turner*, 651 F.3d 743, 751 (7th Cir. 2011), quoting *United States v. Frady*, 456 U.S. 152, 163 (1982).

Chaparro first argues that the government improperly shifted the burden of proof by arguing that Chaparro could have subpoenaed family members to corroborate Ramos and brought forth exculpatory Internet activity records ("router logs") if they existed. These comments were permissible. Not every criticism of a defendant's case by the government raises due process concerns: "If the evidence at issue does not implicate a defendant's right against self-incrimination, and the jury has been properly instructed as to the burden of proof, a prosecutor may comment on a defendant's failure to present evidence contradicting the government's proof at trial." *United States v. Glover*, 479 F.3d 511, 520 (7th Cir. 2007); see also *United States v. Flournoy*, 842 F.3d 524, 528 (7th Cir. 2016) ("[A]s long as it is clear to jurors that the government carries the burden of proof, the prosecutor may tell the jury that a defendant has the power to subpoena witnesses." (alteration in original)), quoting *United States v. Miller*, 276 F.3d 370, 374–75 (7th Cir. 2002). Neither of the prosecutor's statements implicated Chaparro's right against self-incrimination, and the district court properly instructed the jury on the burden of proof. In addition, as in *Flournoy*, the prosecutor "explicitly stated twice that the government bore the burden of proving [Chaparro's] guilt." *Id*.

The other category of statements that Chaparro challenges gives us more pause. Ostensibly upset that the defense had cross-examined government witnesses, the prosecutor demanded: "why all the examination of Erdely and Rich? … Why tear down Erdely and Rich? There is no reason. They didn't hurt him … . And same is really true with Zeus Flores. What did he do to harm the Defendant?" Needless to say, the accused has the right to cross-examine a government witness

whether or not that witness has "hurt" the accused. The pros-ecutor then turned to testimony by Ramos that a police of-ficer's "machine gun" had frightened him during the search. The prosecutor bristled at the suggestion that an officer had acted inappropriately: "Did anybody tell you how the choices and decisions are made by the planners before they do a search warrant? Anybody? Anything? No, no questions asked. Just criticism." Most troubling, the prosecutor re-framed this grievance in much broader terms: "So it seems like we have to face it all the time, *anybody that's associated with law enforcement in this country* just seems to have to face it every time they turn around. *Somebody has got to say that law enforcement behaved badly*, they did bad things." (Emphasis added.)

"Taken as a whole, which is the right way to take a series of questionable remarks by a prosecutor," these comments "exceeded the proper bounds of argument." *Hennon v. Cooper*, 109 F.3d 330, 333 (7th Cir. 1997). The prosecutor's appeal to the hardships faced by "law enforcement in this country" in-voked contemporary political controversies wholly unrelated to the charges. He linked Chaparro with unnamed critics who unfairly attack police officers generally and portrayed himself as the defender of the police. But a prosecutor represents the United States, not the government witnesses: "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935). Accord-ingly, prosecutors must not "appeal[] to jurors' prejudices and fears," *Hennon*, 109 F.3d at 333, or make arguments that are excessively "inflammatory or political." *United States v. Boros*, 668 F.3d 901, 911 n.9 (7th Cir. 2012).

Although the comments were improper, they do not require vacating the conviction on Count Two on plain-error review. The government presented ample evidence to prove its case on the smartphone charge. In any event, the comments were irrelevant: the trial did not concern the propriety of the search of the home. So we cannot say that "the outcome of the trial probably would have been different absent the prosecution's remarks." *Kelerchian*, 937 F.3d at 917; see *United States v. Klemis*, 859 F.3d 436, 442–43 (7th Cir. 2017) (upholding verdict on plain error review despite the prosecutor's "naked appeal to passion rather than reason and evidence" because "the evidence of [the defendant's] guilt was plentiful and compelling").

IV. *Remedy*

The convictions as to Counts One and Three must be reversed because of the erroneous admission of Chaparro's pretrial services statement. The Count Two conviction remains intact. Chaparro was sentenced to three concurrent terms of imprisonment of 210 months each, raising the question of what remedy is required. Neither party objected to the district court's finding that each count carried an offense level of 37 under the Sentencing Guidelines. Indeed, all three counts necessarily carried the same offense level because they were grouped pursuant to Guideline 3D1.2. Because of our decision, however, it matters whether the guideline range for Count Two would have been lower without the convictions on Counts One and Three.

In addition, some of the specific characteristics that increased Chaparro's offense level likely would not apply to the smartphone conviction on its own. A two-level increase for

distribution stemmed solely from the transportation convic-tion. See U.S.S.G. § 2G2.2(b)(3)(F). A five-level increase ap-plied because the offenses involved over 600 images in total, but only two images were found on the smartphone. See § 2G2.2(b)(7)(D). It appears that, without Counts One and Three, Count Two might have carried a substantially lower offense level. Thus, if the government declines to retry Chap-arro, he is still entitled to resentencing on Count Two with a new guideline calculation.

The convictions as to Count One and Count Three of the indictment are REVERSED, and the sentence on Count Two is vacated. The case is remanded to the district court for a new trial on Counts One and Three and/or resentencing on Count Two in a manner consistent with this opinion.

APPENDIX

## Guide to Judiciary Policy

Vol. 8: Probation and Pretrial Services
Pt. A: Pretrial Services Investigation and Report

### Ch. 2: Legal Framework and Principles

### § 240 Confidentiality

#### § 240.10 Purpose

(a)    The confidentiality of pretrial services information is preserved primarily to promote a candid and truthful relationship between a defendant being interviewed and the interviewing officer in an effort to obtain the most complete and accurate information, and to encourage the defendant's participation in the investigation and report process. **See:** H. Conf. Rep. 97-792, 97th Cong., 2d Sess. 8.

(b)    The disclosure of pretrial services information for purposes other than determining pretrial release, particularly for prosecution purposes, would deter a person from cooperating with an officer and deprive the court of necessary information.

#### § 240.20 Confidentiality Regulations

##### § 240.20.10 Statutory Provisions

(a)    Authority of the AO Director

Under 18 U.S.C. § 3153(c)(2), the AO Director is authorized to issue regulations governing the release of information made confidential by 18 U.S.C. § 3153(c)(1).

(b)    Confidentiality of Pretrial Services Information

(1)    As stated in 18 U.S.C. § 3153(c)(1):

"Except as provided in [§ 3153(c)(2)], information obtained in the course of performing pretrial services functions in relation to a particular accused shall be used only for the purposes of bail determination and shall otherwise be confidential. Each pretrial

*Last revised (Transmittal 08-045) September 23, 2019*

services report shall be made available to the attorney for the accused and the attorney for the Government."

**See:** AO Office of the General Counsel Opinion, Sept. 23, 1997, Post-Release Verification.

(2)   Under § 3153(c)(2), exceptions to the confidentiality of such information must be made to permit access:

(A)   by qualified persons for purposes of research related to the administration of criminal justice;

(B)   by persons under contract under 18 U.S.C. § 3154(4);

(C)   by United States probation officers for the purpose of compiling presentence reports;

(D)   to the attorney for the accused and the attorney for the government, to the extent that such information is a pretrial diversion report; and

(E)   in certain limited cases, to law enforcement agencies for law enforcement purposes.

**Note:** As the regulations are mandated by Congress, they are entitled to the full force and effect of the law.

### § 240.20.20 Disclosure of Pretrial Services Information

(a)   Unless authorized by confidentiality regulations or directed by a judge for good cause shown, officers are not authorized to disclose or release pretrial services information, including the file and report. The prohibition on unauthorized disclosure applies regardless of whether such disclosure is sought through an officer's direct testimony or by means of subpoena, subpoena duces tecum, or other form of judicial process.

(b)   Confidentiality regulations do not apply to pretrial services information that normally appears in the court public records, such as demographic or biographical information.

### § 240.20.30 Authorized Disclosures

Any disclosure of pretrial services information permitted under the provisions of the confidentiality regulations or ordered by the judge must be limited to the minimum information necessary to carry out the purpose of the disclosure.

(a)   Resolving Disputed Facts

No. 18-2513                                                                                    43

Disclosure prohibition does not apply when an officer's testimony is necessary to resolve a disputed factual issue that is relevant to a release or detention determination when there is no practical way to resolve that issue, other than by reference to the information, file, or record.
**See:** Guide, Vol. 20, Ch. 8 (Testimony and Production of Records).

(b)     Exceptions in 18 U.S.C. § 3153(c)(2)

Other than for the purpose of bail determination, pretrial services information should not be disclosed, except in the limited circumstances provided in 18 U.S.C. § 3153(c)(2).

(1)     Research, Reviews, and Audits

(A)     Pretrial services information, including national electronic pretrial services information, must be available to AO staff for technical assistance, assessments, or other reviews of a pretrial services office or a probation office that performs pretrial services or for other research related to the administration of justice.

(B)     Upon written application to the chief pretrial services officer or the chief probation officer who supervises pretrial services, and with written notice to the chief of the AO's Probation and Pretrial Services Office (PPSO), the district's pretrial services information must be available to qualified persons for research related to the administration of justice.

(C)     Upon written application to the PPSO chief, national electronic pretrial services information must be available to qualified persons for research related to the administration of justice.

(i)     Under 28 U.S.C. § 602(d), the Director may "delegate any of [his or her] functions, powers, duties, and authority . . . to such officers and employees of the judicial branch of Government as the Director may designate[.]"

(ii)    The Director authorizes the PPSO chief to implement and enforce these regulations.

(iii)   In response to a request for data covered by these regulations, the PPSO chief must consider the following factors:

    (a)    Whether the disclosure is in the best interests of the federal judiciary;

    (b)    Whether the disclosure would promote efficient operation of the federal pretrial services system and the enforcement of pretrial services laws in all United States courts;

    (c)    Whether the requested data can be obtained from other sources more efficiently and effectively;

    (d)    Whether honoring the request will be excessively costly or unduly onerous to AO staff;

    (e)    Whether the request meets the requirements of these regulations;

    (f)    Whether the disclosure of data would violate a statute, regulation, or ethical rule;

    (g)    Whether the disclosure of data would disclose information regarding the exercise of judicial or quasi-judicial responsibilities by federal judicial personnel in the decisional or deliberative process or disclose judge-identifying information;

    (h)    The sensitivity of the information requested; and

    (i)    Any other consideration the PPSO chief may consider germane to the decision.

  (iv)    The PPSO chief may consult with the Chiefs Advisory Group or convene a panel of subject-matter experts to assist in the determination of whether to grant a data request under these regulations.

(D)    "Qualified Persons"

  (i)    "Qualified persons" are persons or organizations:

(a)     whose training and experience are appropriate to the nature of the research in which they propose to engage; and

(b)     who perform such research with adequate administrative safeguards against the unauthorized disclosure of confidential information.

(ii)    Any person or organization to whom pretrial services information is disclosed under this subsection must, before the disclosure of any pretrial services information, execute a nondisclosure agreement— affirming the continued confidentiality of information received. Such agreement must require that any such person or organization protect pretrial services information against unauthorized disclosure and maintain the anonymity of persons to whom information disclosed under this section pertains.

(2)   Contract Agencies

(A)   Pretrial services information is available to individuals or organizations that have contracted with pretrial services to provide supportive services for the custody or care of persons who are released under 18 U.S.C. § 3154(4).

(B)   Contracts with such persons or organizations must include a nondisclosure agreement that recites the obligation of the persons or organizations to adhere to the confidentiality provisions of 18 U.S.C. § 3153(c) and these confidentiality regulations.

(C)   Family Members and Third-Party Custodians

If defendants have been released to the custody of the family, family member, or third-party custodian under 18 U.S.C. § 3142(c)(1)(B)(i), the chief pretrial services officer or chief probation officer who supervises pretrial services may authorize the disclosure of pretrial services information to defendants' family members or a third-party custodian. In any other case, such officer must authorize disclosure of pretrial services information to family members or third-party custodians if:

      (i)    in the officer's opinion, such information would be beneficial to the ongoing supervision or treatment of the defendant; and

      (ii)   the defendant authorizes the disclosure in writing.

           Such officer must not authorize any disclosure to family members or third-party custodians under this section if, in the officer's opinion, the disclosure of such information:

           (a)   would violate a promise of confidentiality to the source of the information;

           (b)   would result in harm to any person; or

           (c)   would compromise the objective of confidentiality as set out in the confidentiality regulations.

(3)    United States Probation Officers

    Pretrial services information must be made available to United States probation officers for preparing a presentence report on the defendant or a codefendant, including any amendments or supplements to such report. The probation officer must not disclose pretrial services information, except when:

    (A)   such information is used in the presentence report; or

    (B)   the probation officer determines that the information is relevant in connection with a proceeding under F.R.Crim.P. 32.1.

(4)    Attorney for the Defendant and Attorney for the Government

    Pretrial services information may be disclosed to the attorney for the defendant and the attorney for the government to the degree that such information is a pretrial diversion report.

(5)    Law Enforcement

    After giving due consideration to any promises of confidentiality to sources of pretrial services information and any harm to any person that might result from disclosure of pretrial services information, the

judge may order disclosure of such information to law enforcement agencies for the following purposes:

(A)    Investigation of a crime committed in the course of obtaining or maintaining pretrial release;

(B)    Investigation of a failure to appear for the criminal judicial proceeding with respect to which pretrial services were provided;

(C)    Investigation of a violation of a condition of pretrial release;

(D)    Investigation of an instance of child abuse or neglect; or

(E)    Protection of the accused, law enforcement personnel, prison officials, or other care providers when:

    (i)    an arrest is contemplated;

    (ii)    the defendant is to be confined;

    (iii)    the defendant has escaped; or

    (iv)    there are other circumstances in which information must be disclosed to:

        (a)    protect such persons or the public against any risk of harm the defendant presents; or

        (b)    protect or provide necessary care to the defendant.

(c)    Violations of Conditions of Release

Under 18 U.S.C. § 3154(5), officers must inform the judge and the U.S. attorney's office of all apparent violations of pretrial release conditions and arrests of persons who are released under supervision.

(d)    Risk of Harm

(1)    Under 18 U.S.C. § 3154(5), officers must inform the judge and the U.S. attorney of any danger that any such person may come to pose to any other person or the community.  In compliance with this section, pretrial services officers:

(A)   must provide such pretrial services information as is necessary to fully advise the judge and the U.S. attorney of the nature and source of the danger; and

(B)   may request authorization to provide a warning to a party at risk or recommend any appropriate modification of release conditions.

**Note:** With the judge's approval, pretrial services officers may disclose such pretrial services information as is necessary to permit a party at risk to take appropriate protective action.

(2)   If a juvenile or a defendant poses an imminent danger to another person or the community and delaying disclosure pending the judge's approval would place another person or persons in danger of physical harm, the chief pretrial services officer or the chief probation officer, or his or her or designee(s) supervising pretrial services may authorize the officer to disclose such pretrial services information as is necessary to permit a party at risk to take appropriate protective action before informing the judge and the U.S. attorney and before obtaining the judge's approval. As soon as possible after such disclosure, the officer must provide the judge and the U.S. attorney with:

(A)   notice of the danger;

(B)   a description of the reasons for making immediate disclosure; and

(C)   the information disclosed.

(e)   Exculpatory Information

(1)   The judge may order the disclosure of pretrial services information if he or she finds that there is a substantial likelihood that the information is:

(A)   material;

(B)   exonerating on the issue of guilt; or

(C)   germane to the issue of truth in an administrative, legislative, or judicial proceeding involving the individual charged or a third party; and

(D)   would not otherwise be available in such a proceeding.

No. 18-2513                                                                      49

(2)  An officer may disclose any pretrial services information to the judge in camera when:

    (A)  the officer believes that pretrial services information contains material that might be disclosed under subparagraph (1) of this section; or

    (B)  when the person charged or a third party alleges that pretrial services information contains such material.

(f)  Diagnostic or Treatment Information

The chief pretrial services officer or the chief probation officer who supervises pretrial services may authorize the disclosure of pretrial services information to a physician, psychologist, psychiatrist, or other health care professional or treatment provider:

(1)  to assist that person in providing diagnostic information in connection with the pretrial services report or pretrial supervision; or

(2)  to provide drug or mental health treatment to the defendant.

(g)  Information of Benefit to the Individual Charged with an Offense

(1)  Upon the defendant's written request, the chief pretrial services officer or chief probation officer who supervises pretrial services may authorize the disclosure of pretrial services information about the person charged with an offense to aid the defendant in:

- obtaining a social services benefit;
- securing employment; or
- providing information to a treatment center or health care provider.

(2)  Disclosure in these circumstances may be authorized if, in such officer's opinion:

    (A)  the disclosure of such information would not violate a promise of confidentiality to the source of the information;

    (B)  the disclosure would not result in harm to any person;

    (C)  the disclosure would not compromise the objective of confidentiality, as stated in the confidentiality regulations; and

        (D)    the defendant is informed that the information disclosed may not be favorable.

(h)    Status Information

The chief pretrial services officer or chief probation officer who supervises pretrial services may authorize the disclosure of pretrial services information consisting of "status" information regarding the defendant, such as current residence, telephone number, and current employer if, in the officer's opinion, the disclosure of such information:

    (1)    would not violate a promise of confidentiality to the source of the information;

    (2)    would not result in harm to any person; and

    (3)    would not compromise the objective of confidentiality as stated in the confidentiality regulations.

(i)    Good Cause

The judge may order the disclosure of pretrial services information if such officer finds that there is good cause for such disclosure after considering:

    (1)    any promise of confidentiality to the source of the information;

    (2)    any harm that such disclosure might cause to any person;

    (3)    the objective of confidentiality, as stated in the confidentiality regulations; and

    (4)    the purpose of the disclosure.

(j)    Use of Pretrial Services Information in Prosecution

Under 18 U.S.C. § 3153(c)(3), pretrial services information is not admissible on the issue of guilt in a criminal judicial proceeding, unless the proceeding is:

    (1)    a prosecution for a crime committed in the course of obtaining pretrial release; or

    (2)    a prosecution for failure to appear for the criminal judicial proceeding with respect to which pretrial services were provided.

(k)    Use of Pretrial Services Information in Cases Other Than Those for Which It Was Obtained

An officer may use pretrial services information obtained in one case to:

(1)    prepare a pretrial services report in another case; or

(2)    supervise a defendant in another case.

**§ 240.20.40 The Pretrial Services Report**

(a)    Notation of Pretrial Services Information

In preparing the pretrial services report, the officer must note only information that is pertinent to the determination of release or detention and release supervision. The officer must not solicit, record, or indicate, in any form, information regarding the offense alleged, unless such information has been obtained from the public record. When such information is obtained from the public record, the source of information must be identified in the report.

(b)    Deletion of Information from the Pretrial Services Report

Officers may ask the judge for whom the pretrial services report is prepared to delete information from the report before the report is made available to the attorney for the defendant and the attorney for the government. Information may be deleted when, after an in camera review, the judge determines that it:

(1)    would violate the promise of confidentiality by which it was obtained from the defendant or a third party; or

(2)    might result in harm to the defendant or a third party.

(c)    Limitation on Making Pretrial Services Information Part of the Record

Pretrial services information must be made available to the judge consistent with 18 U.S.C. § 3154. But pretrial services information must not be made part of the public record. Only information that the judge specifically relies upon in making a release or detention decision and that is otherwise unavailable should appear in the public record. Consistent with this limitation, officers should not be called to testify regarding pretrial services information, unless such testimony is necessary to resolve a material fact.

(d)    Disclosure of the Pretrial Services Report

(1)    The pretrial services report must be made available to the defendant, the defendant's attorney, and the attorney for the

52                                                    No. 18-2513

government under the district court's practice and procedure in connection with:

(A)   a pretrial release or detention hearing;

(B)   a pretrial release revocation proceeding; or

(C)   any judicial proceeding to modify the conditions of release.

**Note:**  Any copies of the pretrial services report disclosed under this provision must be returned to the officer at the hearing's conclusion.

(2)   The chief pretrial services officer or the chief probation officer supervising pretrial services may make the pretrial services report available to new or additional counsel for the defendant if such counsel:

(A)   commenced representation of the defendant after the initial disclosure of the pretrial services report; and

(B)   requests review of the report in writing.

**Note:**  The request must stipulate that the purpose of the review is to prepare for a scheduled or contemplated pretrial release or detention proceeding.  Any copies of the pretrial services report disclosed under this provision must be returned to the officer after inspection by counsel.

(3)   The pretrial services report should not be re-disclosed to other parties by defense counsel or the attorney for the government.